(Nos. 26911, 26914, incl.—
GRANT CONTRACTING COMPANY, Appellant, *vs.* FRANCIS B. MURPHY, Director of Labor, *et al.*, Appellees.

*Opinion filed May 16, 1944—Rehearing denied September 14, 1944.*

CHAPMAN & CUTLER, (ROSCOE C. NASH, and GEORGE H. JIRGAL, of counsel; LORD, BISSELL & KADYK, and EDWARD B. HAYES, of counsel on rehearing,) all of Chicago, for appellant.

GEORGE F. BARRETT, Attorney General, (WILLIAM C. WINES, and MARY V. NEFF, of counsel,) for appellees.

Mr. JUSTICE FULTON delivered the opinion of the court:

This case presents a consolidation, to be heard as one cause, of appeals from four orders entered by the circuit court of Cook county affirming decisions of the board of review of the Department of Labor awarding compensation benefits to claimants, Allison, Murphy, Metzger, Largent, Cluney, Smith and Mattern.

Each of the claimants had filed claims with the Department of Labor, pursuant to the provisions of the Illinois Unemployment Compensation Act, for benefits based on their employment by appellant. The Deputy Claims Administrator denied their claims on the ground that they came within the provisions of section 2(f)(6)(C) of the Unemployment Compensation Act which provides that the term "employment" shall not include "Service performed as an officer or member of the crew of a vessel on the navigable waters of the United States." Ill. Rev. Stat. 1943, chap. 48, par. 218.

The referee, to whom appeals were taken, reversed the decisions of the deputy and held that the claimants were not officers or members of the crew of a vessel on the navigable waters of the United States and were, therefore, entitled to benefits under the act. The circuit court of Cook county affirmed the decisions of the referee.

The facts involved are not in dispute. On or about April 1, 1938, the appellant was engaged in performing a dredging operation in the Illinois river under a contract with the McWilliams Dredging Company which was under contract with the United States Government for improving, deepening and widening established navigation channels of the Mississippi river and its tributary rivers. The appellant performed its work upon a course of the Illinois river from about seventeen miles north of Havana, Illinois, to a point about seventeen miles south thereof and disposed of approximately three million cubic yards of material. In the performance of this work the appellant used two hydraulic dredges approximately one hundred feet long and twenty-six feet wide. One was documented by the Bureau of Navigation of the Department of Commerce. Both dredges were powered by diesel electric units located on the dredges which operated all of the dredging machinery likewise located on the dredges. The documented dredge was self-propelled and capable of moving under its own power. The other dredge necessitated the use of a barge which was furnished power by the diesel unit aboard the dredge. To move the latter dredge any distance it was necessary to lash it to the barge for propulsion and steering. In the course of the dredging operations the dredge moved approximately five hundred feet during a twenty-four hour period. This was accomplished by a "spudding" process which involved the anchoring of the dredge by wires attached to trees on each side of the river or by wires attached to anchors located in the river bed and the use of perpendicular shafts at each corner of the stern of the dredge, which shaft was called a "spud" and which could be raised or lowered into the bed of the river by the machinery located upon the dredge. The dredge could be swung laterally, in either direction, and forward by means of loosening and tightening the anchor wires. When this was done one shaft would be dropped into the river bed holding the

dredge stationary for the actual dredging operation. A variation of this means enabled the dredge to be swung laterally and forward so that the entire river bed might be covered.

A suction line was attached to the dredge at the end of which was located a revolving cutter head which sheared or tore material from the bed of the river. The loosened material was then sucked up through the suction line by a pump located on the dredge and forced into a sixteen-inch discharge line to disposal areas which were located either in shallow water, on the shore line or bordering the shore line. Floating pontoons extending from the dredge to the shore carried the discharge lines to the point of disposal. As became necessary, the discharge line was either lengthened or shortened.

A pipe line crew under the supervision of a "Mate" installed, dismantled and maintained the discharge lines which averaged from five to six hundred feet in length during the course of the work. As the dredge moved forward the pipe line crew synchronized the movement of the pipe line with the action of the dredge and made adjustments both on the water and on the shore. This crew likewise attended to the free flow of the discharge line and occasionally dismantled the line to clear chokes which occurred therein. This crew likewise aided in making repairs to the dredge or the equipment thereon located. Upon moving from one place to another the mate and his crew were required to dismantle the discharge line, load the line onto the barge and lash the pontoons into the tow. When it became necessary to install the pipe line onto the shore, it became the duty of the same crew to clear the thickets to facilitate the location of the pipe.

The dredges were in operation twenty-four hours per day and the claimants were employed by the appellant in eight-hour shifts, approximately ten men to a shift. A captain who normally worked in the daytime only, was in

charge of the dredge. His duties were principally supervisory and during long moves he was in charge of the navigation and control of the propelling mechanism. When the captain was not on duty, a dredge operator or lever man was in charge. He operated the dredging pump, cutter head and spuds and controlled the movement of the dredge. His duties were performed exclusively on the dredge.

The claimant Mattern was a diesel engineer and had charge of the diesel engine and the electrical equipment on the dredge.

The claimants Allison, Murphy, Metzger and Smith were called oilers. They assisted the operator or lever man and their duties consisted of taking care of the oiling of the diesel engine, the hoist, ladder and other machinery. They took soundings and generally assisted the operator and the diesel engineer.

The claimant Largent was a motorboat operator who operated an auxiliary boat used in connection with each dredge. This boat was thirty-two feet long and was used as a dredge tender in transporting the crew from the dredge, transporting supplies to and from the dredge, and transporting the mate and his assistants to and from the pontoon lines, and was used to assist the moving of the pontoon lines and equipment.

The claimant Cluney was called a mate and had supervision of the deck hands or labor. His duties involved the moving of the swinging lines and anchor, opening and closing the pontoon lines, the addition of pipe to the pontoon lines, handling the anchors on the pontoon lines and the location and maintenance thereof, both on the water and on the shore. Each of the claimants were paid wages upon an hourly basis and were not engaged for any definite term. They did not sign Ship's Articles upon entering their employment, were not licensed seamen, were members of local laborers' unions and lived and boarded at home.

There was testimony on the part of some of the claimants that the mate was ofttimes called a labor foreman.

The applicable section of the Unemployment Compensation Act is identical in its exception provision to section 907(c)(3) of the Federal Social Security Act (42 U. S. C. A. par. 1107(c)(3) and section 614(c)(4) of the Federal Unemployment Tax Act. (26 U. S. C. A. par. 1607(c)(4).)

Pursuant to the Federal Social Security Act and the Federal Unemployment Tax Act the Treasury Department promulgated Regulation 107, sec. 403.211, which in part reads as follows: "The expression 'officers and members of the crew' includes the master or officer in charge of the vessel, however designated, and every individual subject to his authority serving on board and contributing in any way to the operation and welfare of the vessel. The exception extends, for example, to services rendered by the master, mates, pilots, pursers, surgeons, stewards, engineers, firemen, cooks, clerks, carpenters, deck hands, porters and chamber maids and by seal hunters and fishermen on sealing and fishing vessels."

With the exception of the reference to seal hunters and fishermen aforementioned the Unemployment Division of the Illinois Department of Labor adopted an identical regulation. In addition thereto the Department of Labor had in effect Interpretative Ruling 070-3 which reads as follows: "(3) Floating Pile Drivers, etc. Services performed as an officer, or member of a crew, of floating pile drivers, mooring scows, barges, dredges and floating grain elevators are excluded from employment under the Act by virtue of section 2(f)(6)(C), if such vessels are on the navigable waters of the United States."

It is admitted for the purposes of the suit that the Illinois river is one of the navigable waters of the United States and that the dredges used by the claimants are "vessels." The principal question before us then is whether

the claimants performed services as members of a crew within the meaning of the exclusionary clause of the Unemployment Compensation Act.

The appellant, relying upon the Regulations of the Department of Labor, failed to make contributions under the Unemployment Compensation Act with respect to the wages paid by it to the claimants during the period of their employment and contends that, on the facts, the claimants were officers or members of the crew of a vessel on the navigable waters of the United States and are, therefore, excluded from the benefits of the Unemployment Compensation Act by section 2(f)(6)(C).

The Illinois Unemployment Compensation Act was enacted in 1937. A great majority of the States accepted the invitation of the Federal Government to co-operate in the solution of the national unemployment problem and passed acts similar to the Federal act.

In the case of *Buckstaff Bath House Co.* v. *McKinley,* 308 U. S. 358, 60 S. Ct. 279, 84 L. ed. 322, the United States Supreme Court, in referring to the Federal Social Security Act, said it was designed "to operate in a dual fashion—state laws were to be integrated with the Federal Act; payments under state laws could be credited against liabilities under the other. That it was designed so as to bring the states into the cooperative venture is clear."

Remedial legislation of this sort should be liberally construed to the end that the benefits intended under the provisions of the act are received by employees. Where there is an exemption from a general tax, the statute should be strictly construed against the party asserting such exemption, and the rule requiring liberal construction in favor of a taxpayer is not applicable where exemption is claimed. *Puget Sound Bridge & Dredging Co.* v. *State Unemployment Compensation Com.* 168 Ore. 614, 126 Pac. 2d 37.

While the question whether the claimants were officers or members of the crew of a vessel on the navigable waters

of the United States is a question of fact, it is necessarily an ultimate conclusion to be derived from an application of the statute to the basic facts involved. In this respect it is well to remember that rules of administrative agencies upon similar acts containing similar words, though persuasive, are not binding or controlling upon the courts. *Oak Woods Cemetery Ass'n* v. *Murphy*, 383 Ill. 301; *Shore Fishery, Inc.* v. *Board of Review*, 127 N. J. L. 87, 21 Atl. 2d 634.

In defining the word "crew," although having several well-known significations, it becomes apparent upon reading the various interpretative litigation that there exists a great diversity of opinion as to who is a member of the crew of a vessel. There appear to be both liberal and strict constructions of the term. Very little help is derived by reference to cases interpreting such terms used in other acts such as the Long Shoremen's and Harbor Workers' Act, (33 U. S. C. A., par. 901,) or the other various State workmen's compensation acts and unemployment compensation acts.

In the case of *South Chicago Coal and Dock Co.* v. *Bassett*, 309 U. S. 251, 60 S. Ct. 544, 549, 84 L. ed. 732, through Chief Justice Hughes the court said the word "crew" does not have an absolutely unvarying legal significance, and the court found "little aid in considering the use of the term 'crew' in other statutes having other purposes."

The exact problem presented in this case has not heretofore been passed upon by our court and we are confronted with opposing and conflicting decisions from State courts of last resort, based upon very similar factual situations. The appellant relies heavily upon the case of *Woods Bros. Const. Co.* v. *Iowa Unemployment Compensation Com.* 229 Iowa, 1171, 296 N. W. 345, which was a case involving claims filed by employees who were members of barges, laying lumber mats on the bed of the Mis-

souri river in order to improve navigation. There it was said, in response to the identical questions raised here, that in interpreting the Unemployment Compensation Act serious consideration is to be given to the construction placed upon a similar Federal act by the administrative agency charged with its execution, and that the construction of the words "member of the crew" as an individual contributing in any way to the operation and welfare of the vessel is in harmony with Federal decisions, citing *The Buena Ventura,* 243 Fed. 797.

The Iowa court further relied upon the case of *Saylor* v. *Taylor,* 77 Fed. 476, wherein it was said: "Hence it is that in all times and in all countries those who are employed upon a vessel in any capacity, however humble, and whose labor contributes in any degree, however slight, to the accomplishment of the main object in which the vessel is engaged, are clothed by the law with the legal rights of mariners, 'no matter what may be their sex, character, station or profession.' " The Iowa opinion further held that all that the claimants in that case did in their employment contributed to the accomplishment of the main object in which the vessels were engaged, namely, the maritime project of control of the channel, and the improvement of the navigability of the river. The words "member of a crew" were thus found to mean a person contributing in any way to the operation and welfare of the vessel. The court there found that the claimants supplied the power that moved the vessels, they operated the vessels, and they accomplished the only enterprise in which the vessels were engaged, namely, the improving of the navigability of the river, and the safety, welfare and control of the vessels rested in their hands.

Appellees cite as controlling, the cases of *Puget Sound Bridge and Dredging Co.* v. *State Unemployment Compensation Com.* 168 Ore. 614, 126 Pac. 2d 37; *Shore Fishery, Inc.* v. *Board of Review,* 127 N. J. L. 87, 21 Atl.

2d 634; *Berwind White Coal Mining Co.* v. *Rothensies,* 137 Fed. 2d 60, and *In re Cassaretakis,* 289 N. Y. 838, 44 N. E. 2d 391.

The *Puget Sound case* is a decision diametrically opposed to the *Woods case.* There the claimant was a fireman on a drill barge which was engaged in deepening and widening the channel of the Columbia river. The court recognized the diversity of opinion among the decisions and, as stated in the *South Chicago Coal & Dock Co. case,* (309 U. S. 251, 60 S. Ct. 544, 549, 84 L. ed. 732,) recognized that little help was to be derived from the meaning given to the words "member of a crew" as used in acts similar to the Unemployment Compensation Act and that to such terms the ordinary and commonly accepted meaning in maritime law was to be accorded, to the end that the purposes of the act be accomplished. It was there said: "Ordinarily, when the crew of a vessel is referred to, those persons are naturally meant who are on board and aiding her in navigation. It is difficult to conceive of a crew of a vessel without a captain or an officer in charge. In the instant case, we look upon Waggoner as a foreman or 'boss' and not as a 'captain.' It is true that the work in which Sedoris was engaged was a maritime project in aid of navigation and commerce. However, as fireman he had nothing to do with the welfare of the vessel so far as its navigation was concerned. The 'vessel' upon which he worked was not far removed from being a stationary dredge. It requires a severe stretching of the imagination to think of the services performed by Sedoris as being similar to those rendered by seafaring men. * * * We think it was intention of Congress to except from the operation of the act those employees engaged in maritime work who are ordinarily considered as seafaring men, leaving that fact to be determined by the circumstances of each case. We believe that the term 'crew' should not be limited to those persons on board who are physically

causing the vessel to move through the water, but to those contributing in some way to its operation and welfare as an instrument of navigation. * * *

"In order that the services performed by an individual upon a vessel on navigable waters of the United States be excluded from coverage under the Unemployment Compensation Law, it must be shown that such services substantially tend to promote the welfare of the vessel as an agency of navigation. It is not sufficient only to show that such services are incidental to navigation."

The court quoted from both *The Bound Brook,* 146 Fed. 160, and *The Buena Ventura,* 243 Fed. 797, cases holding that, when a crew was referred to, those persons are naturally and primarily meant who are on board aiding in navigation. It also referred to the *Woods Bros. Const. Co. case* and distinguished the same on the ground that in the opinion of the Oregon court the work in question was merely incidental to navigation and had nothing to do with the welfare of the vessel so far as its actual navigation is concerned.

The *Shore Fishery case* (21 Atl. 2d 634,) supports the Oregon court and is likewise in point. There the claimants were fishermen who pushed their boat through the surf, after which the boat went under its own power to the place where the fishing was accomplished. The greater portion of the claimants' time was consumed in hauling the boat from point to point and handling the nets. This case was decided in the trial court of New Jersey before three judges, but its holdings are in entire accord with the *Puget Sound case.*

It is readily seen from the above and foregoing that a determination as to whether the claimants in the instant case were members of a crew within the exclusionary provision of the Unemployment Compensation Act depends upon a construction of the meaning of the term with a view to the specific facts involved. Due to the lack of

uniformity and the particular wording of the section involved, it becomes a difficult task to justify the decisions either way. It seems, however, that the purpose of the Unemployment Compensation Act was to effectuate a broad scope toward the effacement of unemployment. The act should be strictly construed against one attempting to come within the exceptions to the broad provisions of the act. The burden is, therefore, upon the appellant to prove that it is exempt under the exclusionary provisions. Without question the primary purpose of the barges upon which the claimants here were employed was the deepening and improving of the navigability of the channel. The movement of the barges was a mere incident to the main purpose involved. No semblance to the ordinary organization of a ship's crew was maintained although nautical terms were used in reference to the various laborers and bosses. These men were engaged in excavation primarily. They worked in eight-hour shifts, they lived on the land and ate and slept at home each night. They had no licenses, had never signed any Ship's Articles and did not in any manner perform services that tended to fulfill the ordinary understanding of navigation. They were only incidentally engaged in the accomplishment of the purpose in the movement of the barge. The language of the court in the *Puget Sound case* is convincing and seems to bear the more logical conclusion. We believe that the purpose of the act was to exclude those from coverage under the Unemployment Compensation Act whose services substantially tended to promote the welfare of the vessel as an agency of navigation.

We, therefore, believe that the referee's decisions awarding benefits to claimants were correct and that the circuit court properly upheld the same. The judgments of that court are affirmed.

*Judgments affirmed.*