BRADFORD BIGGER, Appellant, v. UNEMPLOYMENT COMPENSATION COMMISSION OF THE STATE OF DELAWARE, Appellee.

(*February* 6, 1946.)

TERRY, J., sitting.

*Morris Cohen* and *I. B. Padway* (of Washington, D. C.) for the Appellant.

*Caleb Layton, III,* for the Appellee.

Superior Court for New Castle County, No. 207, March Term, 1944.

TERRY, J.:

Prior to January 7, 1944, Bradford Bigger, the appellant, a member of the Brotherhood of Painters, Decorators, and Paperhangers of America, Local No. 100, A. F. of L., was employed as a painter by Robert K. Peoples, 1423 Woodland Avenue, City of Wilmington, at the rate of $1.375 per hour for an eight hour day. On January 8, 1944, he registered with the Unemployment Compensation Commission and applied for benefits under the Unemployment Compensation Act of 1937, Ch. 258, Vol. 41, Laws of Delaware.

The United States Employment Service on January 17, 1944, referred him to work at the Deepwater Plant of the DuPont Company, said plant being located in New Jersey just across the Delaware River from Wilmington. Without investigation the appellant refused to apply for the work for the following reasons:

(1) Because the rate of hourly pay was $1.25.

(2) Because some spray gun painting was done at the plant.

(3) Because it was non-union work subjecting him to disciplinary action by his Union.

The Acting Claims Deputy of the Commission ruled that the appellant had failed to accept suitable work when offered under the provisions of Section 5(a) of the Act. An appeal was preferred to the Appeals Referee, who, after full hearing, sustained the ruling of the Claims Deputy.

From this ruling the appellant appealed to the Commission, which sustained the decision of the Appeals Referee. The appellant thereupon appealed to this Court under the provisions of Section 6(i) of the Act.

The Assignments of Error are—

A. The Commission erred in not taking into consideration Section 2(i) (2) (A) (B) (i) (ii) of the Act.

B. The Commission erred in not taking into consideration Section 5(c) 1 of the Act.

C. The Commission erred in its finding that in the language of Section 5(c) (2) (a) of the Act "* * * if the position offered is vacant due directly to a strike, lockout or other labor dispute." The words "other labor dispute" refer directly to the words "strike" and "lockout" and are in fact descriptive of a condition something in the nature of a strike or lockout.

D. The Commission erred in its interpretation of the language contained in Section 5(c) (2) (c) of the Act.

E. The Commission erred in not taking into consideration Section 5(c) (2) (b) of the Act.

Under Section 5 of the Act an individual may be disqualified for benefits "if he has failed, without good cause, either to apply for available suitable work, when so directed by the employment office or the commission, or to accept suitable work when offered him"—the determination of suitability of work to be considered with respect to "the degree of risk involved to his health, safety, and morals, his physical fitness and prior training, his experience and prior earnings, his length of unemployment and prospects of securing local work in his customary occupation, and the distance of the available work from his residence"; and no work shall be deemed suitable and benefits shall not be

denied for a refusal to accept new work if the position is vacant due directly to strike, lockout or other labor disputes, or if the wages, hours or other conditions of the work are substantially less favorable to the individual than those prevailing for similar work in the locality, or, if, as a condition of being employed, the individual would be required to join a company union or to resign from or refrain from joining any bona fide labor organization.

■ Prior to a discussion of the assignments, thought should be directed to the underlying purpose of an enactment providing for unemployment compensation. It has been said to be a thing of necessity under our present scheme of life. It is designated to absorb the shock, so to speak, between terms of employment. It is entirely social in its aspect, and is clearly intended to safeguard employees against the hardships ordinarily occasioned from temporary stoppage in work.

■ Without doubt, it is universally recognized that employees may associate themselves together for the purpose of advancing and promoting their mutual interest, provided in so doing they keep within the bounds of lawful purpose. The labor union springs from this association, and today it is a living thing and strength must be associated with its constant growth. Its challenge to industry in respect to working environment, wages, hours, etc. has been made effective by National and State Legislation, together with Court sanction, whereby many principles and powers have been indelibly written into the law. The Constitution, rules, and regulations of Unions have been given the force and effect of law, insofar as employees are concerned, until now in many instances when Courts are called upon to apply a rule or regulation, merely the question of its reasonableness and legality are before us, since the power to adopt is a recognized right.

The Supreme Court of this State in the case of *Motion Pictures Machine P. P. U. etc. v. Rialto Theatre Co.,* (*Del. Ch.*) 17 A. 2d 836, 840, stated:

"The labor organization is an embodiment of the axiom that in unity there is strength. The labor union is a lawful organization. No court holds to the contrary. How far such an organization may go in its effort to promote the interests of its members without unlawfully trespassing on the rights of others is a question that gives rise to opinions as widely divergent as human philosophies may differ. Clashes of interest in the struggle for individual or class betterment are inevitable. Competition in any endeavor may bring advantage to some, injury to others. Damage for which the law affords no remedy, or an inadequate remedy, may be the consequence, for, clearly, human activities may not be so curtailed or circumscribed as to prevent one, either alone or in concert with others, from doing anything at all to better his condition in life. Obviously there must be limitations. In a complex world the public welfare demands that rights and interests be defined, reconciled and adjusted."

Necessity requires a liberal construction of the provisions of the Unemployment Act in favor of the ones to be benefited thereunder; otherwise, the true reason of its enactment would in the main be ignored, and the purposes sought to be accomplished defeated.

The appellant under Assignment A contends that the Deepwater Plant afforded employment to appellant exclusively within the State of New Jersey, contrary to Section 2(i) (2) (A) (B) (i), (ii). The section is as follows:

"(2) The term 'employment' shall include an individual's entire service, performed both within and without this State if—(A) The service is localized in this State;

or (B) The service is not localized in any State but some of the service is performed in this State and (i) the base of operations, or, if there be no base of operations, then the place from which such service is directed or controlled, is in this State; or (ii) the base of operations or place from which said service is directed or controlled is not in any State in which some part of the service is performed but the individual's residence is in this State."

The appellant contends that under a proper construction of (2) (a) and (b) above that a person, in order to recover unemp'oyment compensation, must be afforded employment wholly within the State of Delaware, or employment within and without the State, and that, since the employment referred to was entirely without the State he was justified in refusing to accept the referral and apply for the work at the Deepwater Plant, for had he done so he would have disqualified himself for unemployment compensation under the Act.

Plainly, the service to be performed was not localized in this State; in fact, no part of such was to be performed here. However, the record clearly discloses that the place from which the services were directed or controlled was in this State, and this State is the home of the DuPont Company; also, the plaintiff resides here. The assertion, therefore, that a person to recover unemployment compensation under our Act must be afforded employment wholly within the State or employment within and without the State, and that he can properly refuse to accept a referral of employment which is wholly to be performed without the State, is not justified by the language employed, nor is the appellant justified in the assertion made, or the fear expressed, that, if he had accepted the work offered, upon its termination he would be without the protection of the Act.

Under Assignment B the appellant contends that since the work necessitated in part the use of a spray gun he was justified in refusing the same, as Article 6, Section 17 of the Local Union provides:

"Members are strictly forbidden to operate spraying machines of any description at any branch of painting, and dipping is also prohibited."

He argues the use of a spray gun would subject him to disciplinary action on the part of his Union which might result in his expulsion therefrom.

Section 5(c) (1) is as follows:

"In determining whether or not any work is suitable for an individual, the commission shall consider the degree of risk involved to his health, safety, and morals, his physical fitness and prior training, his experience and prior earnings, his length of unemployment and prospects for securing local work in his customary occupation, and the distance of the available work from his residence."

In determining whether or not work is suitable the Commission must consider the degree of risk involved to the employee's health. It is contended that the use of a spray gun in painting is injurious to the health, and since the rule of his Union forbade the use of a spray gun by its members, his refusal to accept the employment was justified. The language employed under Article 6 aforesaid does not announce that the prohibition was based upon a hazard to health; nevertheless, the argument is advanced that a hazard arises merely from the use of spraying machines. Of course, the question presented is factual. Admitting arguendo that Article 6 was adopted as a health measure rather than as a means of combating a labor saving device, yet the language emp'oyed in the light of its adoption must meet the test of reasonableness when viewed in respect to

all the facts and circumstances found to be present. The appellant demurs to this suggestion, and contends that I should take judicial notice of the fact that the use of a spray gun in painting constitutes a health hazard. *United States v. Carrozzo*, (*D.C.*) 37 *F. Supp.* 191; *United States v. Bay Area, et al.*, (*D.C.*) 49 *F. Supp.* 733. Of course, judicial notice depends upon common knowledge of a fact in order to do away with the necessity of proof, and for this reason I cannot accept the conclusions as reached in the above cases. It is apparent that spray gun painting under certain circumstances would undoubtedly constitute a health hazard and be injurious, while on the other hand there might exist precautionary measures and equipment that would eliminate the hazard entirely. In this case the record discloses that the DuPont Company used every modern precaution in spray gun painting; that the operators are furnished with respirators and are protected around the head and neck and usually they use some greasy substance spread upon their faces. The testimony is devoid of any evidence suggesting that spray gun painting with modern spray gun appliances such as used at the Deepwater Plant is a hazard to the health of the employees using the same. The Commission considered most carefully the degree of risk involved, and it seems clear that the question of hazard to health is not one for the Union to arbitrarily decide, which in its scope would be so far reaching as to include spray gun painting under all circumstances and conditions. Therefore, from the facts and circumstances at hand the appellant's refusal to accept work, although it necessitated in part the use of a spray gun, was not justified.

The appellant contends under Assignment C that a labor dispute existed at the Deepwater Plant, and by reason thereof he was justified in refusing the employment under Section 5(c) (2) (a) of the Act, which Section is as follows:

"Notwithstanding any other provisions of this Act, no work shall be deemed suitable and benefits shall not be denied under this Act to any otherwise eligible individual for refusing to accept new work under any of the following conditions: (a) If the position offered is vacant due directly to a strike, lockout, or other labor dispute."

He contends that a labor dispute was in existence between a Camden, N. J. Union and the DuPont Deepwater Plant. The evidence reveals that there was a dispute in existence, in that the relations between the Camden Union and the Deepwater Plant were not good because of a lower wage scale, and because the Union refused to provide labor at the Deepwater Plant at the suggestion of the company. The so called dispute did not result in picketing the plant, branding the company as unfair, or bring about any pressure at all upon the company other than the refusal of the Union to countenance a lower scale of wages.

The term "labor dispute" as used in the Act is not susceptible to precise definition. Resort must be had to construction. Where general words follow the enumeration of particular classes of things they will be construed as having reference to matters or things of the same general nature. The particular word may be said to be the genus, the general word used for including other species of the same genus. The rule manifestly rests upon the reason that, if the Legislature had intended the general word to be used in an unrestricted sense, no mention would have been made at all of the particular classes, and it is very generally held that the words "other" or "any other" following an enumeration of particular classes are to be read as meaning "other such like" and include only words of like kind of character. 59 C.J. 982.

The appellant in support of his contention has cited the following cases: *Lauf v. E. G. Shinner & Co.*, 303

*U.S.* 323, 58 *S.Ct.* 578, 82 *L.Ed.* 872; *American Federation of Labor v. Swing,* 312 *U.S.* 321, 61 *S.Ct.* 568, 85 *L.Ed.* 855; *Senn v. Tile Layers Protective Union,* 222 *Wis.* 383, 268 *N.W.* 270. I have read the cases with interest and find in evidence in each case picketing or some other form of pressure. I am unable to find a case, nor has one been cited, holding that such a dispute as was in existence in the present case would justify the employee in not accepting the employment. The facts as presented do not give rise to the dignity of a labor dispute within the meaning of the Unemployment Act.

Under Assignment D the appellant contends that his refusal to accept the referral was justified, as the same concerned non-union work, and that his acceptance thereof would have subjected him to disciplinary action by his Union, which would have resulted ultimately in his expulsion therefrom.

Section 5(c) (2) (c) is as follows:

"Notwithstanding any other provisions of this Act, no work shall be deemed suitable and benefits shall not be denied under this Act to any otherwise eligible individual for refusing to accept new work under any of the following conditions: * * * (c) if as a condition of being employed the individual would be required to join a company union or to resign from or refrain from joining any bona fide labor organization."

The appellant contends that he has been a member in good standing of his Union for quite some time, and that certain benefits have accrued to him by reason thereof. He contends that he is bound by Section 303 of its Constitution, which recites—

"Any member going to work on a job declared unfair

or non-union shall, after trial and conviction, be disciplined as the Director, Counsel or Local Union may decide."

Likewise, Section 314 providing penalties—

"Decisions and penalties imposed upon the members, officers, locals, district counsels, or other subordinate bodies found guilty of charges may consist of reprimands, fines, suspensions, expulsions, revocations or commands to do or perform, or refrain from doing or performing, specified acts * * *."

It is said, that in the event the appellant had accepted the referral, he would have been fined, and that if the fine had not been paid in due course, he would have been expelled as a member of the Union. Of course, such a conclusion is merely conjectural for the reason that under Rule or Section 314 aforesaid expulsion could be decreed in the first instance.

The appellant contends that the language "condition of being employed" as found in Section 5(c) (2) (c) of the Act should be interpreted as meaning a condition which inheres in the entering upon or carrying out of the employment, as distinguished from a condition imposed by an employer as a part of the contract of employment. Further, that the words "resign from" as recited in Section 5(c) (2) (c) should be construed to be analogous to the words "expelled from," and, further, that Rule or Section 303 aforesaid of the Union's Constitution is reasonable and should be held to be valid.

The appellee contends that a proper construction of the language "condition of being employed" would be to say that it relates to a condition imposed by the employer as a part of the contract of employment by which the employee is offered employment, and that, since no condition was imposed requiring the appellant to join a Company Union

or to resign from his Union, he was not justified in refusing the referral.

The appellee further contends that to give legal sanction to Rule 303 of the Union's Constitution would in effect constitute an unlawful delegation of legislative power.

Three questions are presented by the appellant under this assignment.

1. The meaning to be ascribed to the language "condition of being employed" as included in Section 5(c) (2) (c) of the Act.

2. The validity of Rule or Section 303 of the Union's Constitution.

3. The meaning to be ascribed to the words "resign from" as included in Section 5(c) (2) (c) of the Act.

(1)    The statutory term "employment" describes the station or situation in which an employee finds himself. *State v. Iden,* 71 *Ohio App.* 65, 72, 47 *N.E.*2d 907. To be "employed" in anything means not only the act of doing it, but also to be engaged to do it, to be under contract or order to do it. *United States v. Morris,* 14 *Pet.* 464, 10 *L.Ed.* 543; *Cox v. Brown,* 227 *Mo.App.* 157, 50 *S.W.*2d 763. The word "employed" is a verb of past and present tense, and cannot be accurately used potentially to indicate future action unless qualified by additional words. *Independent Transportation Co. v. Canton Ins. Office, (D. C.)* 173 *F.* 564. The Court of Appeals of Franklin County, Ohio in the case of *Chambers v. Owens-Ames-Kimball Co., et al., (Ohio App.)* 62 *N.E.*2d 496, 499, in construing the language "as a condition of being so employed," as the same appears under G.C. § 1345-6(e) (1) of the Ohio Unemployment Compensation Act, stated:

"It is our judgment that the 'condition of being so employed' means the condition arising by reason of actual employment, actual work on the job."

The language "condition of being employed," as set forth under Section 5(c) (2) (c) of our Act, embraces in my opinion all elements of the employer and employee relationship which in fact customarily attend employment to the same extent as if such conditions were in fact included within the precise terms of a written or oral contract of employment. Any other construction would do violence to a normal and natural textual reading of the Act—the purpose of which, insofar as the present case is concerned, was to protect those who had Union affiliations and to safeguard, so to speak, their Union memberships. The duty clearly rests upon the Commission to find suitable employment, and "suitable employment" must mean the status in which an employee finds himself when he is working on a job. The emphasis is not placed upon the written or oral terms of a contract of hire, and had the Legislature so intended, it would have so stated.

(2) The time has long passed to question the rule-making power of Unions; however, questions concerning the reasonableness and validity of rules when adopted are a constant function of all Courts. The purpose underlying the adoption of Union rules must be predicated upon the theory of the advancement of the cause of labor, and the compelling force employed to make effective such rules must at all times be lawful in its scope of operation. Rule 303 of the appellant's Union forbids the members thereof from working on non-union jobs. This particular rule was adopted prior to the enactment of our Unemployment Compensation Act. It is not discriminating in its operation, since it applies to all employers in like manner, and the record is devoid of any suggestion that its underlying pur-

pose is other than to advance and benefit the working conditions that surround the employment of labor. I am unable to find anything unlawful in respect to it. In fact, the great weight of authority is to the effect that a rule of a Labor Union forbidding its members to work with non-union men is valid, but that no unlawful means may be resorted to for its enforcement. 31*Am.Jur.* 857. Therefore, it seems to matter not what others outside the Union may think of the policy or justice of such a rule. Apparently, then, such questions concern matters outside the province of Courts, and in regard to other questions of economic or political aspect the remedy, if a remedy be needed, must be made by legislative enactment.

(3) The meaning to be ascribed to the words "resign from," as the same appears in Section 5(c) (2) (c), presents an interesting question. The appellant contends, in order to carry out true legislative intent, that, the words should be held to be synonymous to the word "expulsion," as the same appears in Rule 314 of the Union's Constitution. The argument is advanced that, since the intent of the Act is clear, the form of expression employed should give way to the substance or results sought to be attained. The words "resign" and "expel" have opposite meanings, as the word "resign" is defined by Webster to mean, "to give up; to surrender by a formal act; to yield; to relinquish; to give up one's office or position, to withdraw from"; and is synonymous to such words as "abandon," "renounce," etc., while the word "expel" is defined by Webster to mean, "to drive or force out; to eject; to cut off from membership in or the privileges of"; and is synonymous to the words "exile," "oust," "dispossess," etc.

I have given much thought to the argument in the light of the purpose of the enactment itself; nevertheless, I am restrained in the face of the clear and positive use of the

words "resign from" to say that they, as written into Section 5(c) (2) (c), do not in fact express that which the Legislature unequivocally intended. I find no ambiguity resulting from their use, and Courts are not at liberty to construe a statute or parts thereof when the language used is plain and readily understandable, but must give effect to the legislative intent as clearly expressed. It is equally so, where the language adequately expresses the intention of the Legislature, that it must be given effect regardless of the consequences; such as, hardships, inconveniences, or even injustices. 59 *C.J.* 968.

The appellant relies strongly on the case of *Harvey Edward Chambers v. Owen-Ames-Kimball Co., et al., (Ohio App.)* 62 *N. E.* 2d 496, as authority concerning this assignment. The case concerns a somewhat similar circumstance under the Ohio Unemployment Compensation Act. Section G.C. § 1345-6(e) and (e) (1) of the original Ohio Act recited—

"e. No individual otherwise qualified to receive benefits shall lose the right to benefits by reason of a refusal to accept new work if

"(1) As a condition of being so employed, he would be required to join a company union, or to resign from or refrain from joining any bona fide labor organization."

It will be noted that under the original Ohio Act subsection (e) (1) corresponds in substance with Section 5(c) (2) (c) of our Act. However, at a subsequent session of the Ohio Legislature subsection (1) aforesaid was amended by adding after the word "organization" at the end of said subsection the following:

"Or would be denied the right to retain membership in and observe the lawful rules of any such organization."

It is apparent that the Ohio Legislature by reason of the enactment of the amendment intended to provide for a circumstance such as contended for by the appellant in the present case; for, if the words "resign from," as the same appeared under subsection (1) in the original Ohio Act, mean "be denied the right to retain membership in and observe the lawful rules of any such organization," then the amendment was a useless thing—a mere repetition of what had theretofore been stated.

Under Section 506, subd. 1(a) of the *New York Unemployment Compensation Act, Labor Law, Consol.Laws*, c. 31, the following appears:

"(a)   acceptance of such employment would either require the employee to join a company union or would interfere with his joining or retaining membership in any labor organization."

I am of the opinion that the interpretation sought by the appellant cannot be attained by judicial construction. Resort must be had to legislative sanction. The contentions as advanced under this assignment cannot be sustained, and the employment offered must be held to be suitable employment under the Act.

Under Assignment E the appellant contends the Commission erred in not taking into consideration 5(c) (2) (b) of the Act. This assignment concerns the question of wages. He contends the scale of wages as adopted by his Union was $1.32½ per hour, as compared with that of $1.25 per hour at the Deepwater Plant. He argues, had he accepted the employment at the wage scale offered, that he would have subjected himself to expulsion by his Union. He relies upon Section 5(c) (2) (c) of the Act in conjunction with Section 5(c) (2) (b) thereof as justification of his refusal to accept the employment. A discussion of this assignment would be

but a repetition of what I have heretofore said regarding Assignment D, as the assignments differ only in that D concerns the Union's refusal to permit its members to work on non-union jobs, while E concerns the Union's refusal to permit its members to work for a lower wage scale than that as designated by the Union. Admitting arguendo the validity of a Union rule which forbids Union members from working at a lesser wage scale than that as adopted by the Union, nevertheless, my conclusion would be the same as expressed under paragraph three of Assignment D aforesaid.

The appellant during the oral argument contended that the Commission did not consider Section 5(c) (2) (b) in its entirety, in that the length of time required in going and returning from work at the Deepwater Plant rendered the work less favorable to him than similar work in the locality; also, his length of employment and his prospects for securing local employment in his customary occupation.

A reading of the opinion as handed down by the Commission clearly connotes that it made a careful and exhaustive study of these questions and concluded that the conditions of work were not substantially less favorable at the Deepwater Plant than those prevailing generally in the Wilmington area. The appellant testified, as of the date of the termination of his employment in Wilmington, that his prospects of local employment were good, and that he still would have refused to accept the employment offered even though he had known that he would not be employed locally for a period of six months.

The order herein reviewed is affirmed.