STATE OF WEST VIRGINIA, BY C. S. DAVIS, DIRECTOR, ETC.

*v.*

M. H. HIX, *Clerk, etc.;* BOARD OF REVIEW, *etc.;* BLACK
EAGLE COAL COMPANY, *Employer;* AND ED JACKSON,
*Claimant.*

(No. 10097)

STATE OF WEST VIRGINIA, BY C. S. DAVIS, DIRECTOR, *etc.*

*v.*

M. H. HIX, *Clerk, etc.;* BOARD OF REVIEW, *etc.;* JEFFREY
D. DeWITT INSULATOR CORPORATION, *Employer;* AND
CORA B. SPERRY, *Claimant.*

(No. 10098)

STATE OF WEST VIRGINIA, BY C. S. DAVIS, DIRECTOR, *etc.*

*v.*

M. H. HIX, *Clerk, etc.;* BOARD OF REVIEW, *etc.;*
POCAHONTAS FUEL CORPORATION, *Employer;* AND
ALEX WITT, *Claimant.*

(No. 10099)

Submitted February 2, 1949. Decided March 15, 1949.

*Kenna and Riley, Judges,* dissenting.

*Franklin W. Kern, Leo Loeb,* for petitioner.

*Jackson, Kelly, Morrison & Moxley, Frank R. Lyon, Jr., Robert G. Kelly,* for respondents *Black Eagle Coal Co. and Jeffrey D. DeWitt Insulator Corp.*

*Crockett & Tutwiler, J. S. Crockett,* for respondent
*Pocahontas Fuel Co., Inc.*

Fox, JUDGE:

These cases come to this Court on writs of certiorari
from the Circuit Court of Kanawha County, under the
provisions of Section 27 of Article 7 of Chapter 1, Acts of
the Legislature, Second Extraordinary Session of 1936,
and are prosecuted by the Director of Unemployment
Compensation. The claims here involved were separately
filed and prosecuted before the Director of Unemployment
Compensation, and the statutory reviewing bodies, to the
Circuit Court of Kanawha County. Each of the claim was
denied by the Board of Review and, upon review of its
action, was affirmed by the Circuit Court of Kanawha
County. We awarded the writ of certiorari in each case
on September 20, 1948.

Each of the above named claimants ceased to work on
account of a health condition. The claim of Alex Witt, an
employee of the Pocahontas Fuel Corporation, involves
the stoppage of work by Witt on account of a bladder con-
dition. The record discloses through the certificate of a
physician that he had been passing blood in his urine since
April, 1947. His claim for compensation was filed on No-
vember 24, 1947, and he had given up his job some few
days before that date. The claim of Ed Jackson, an em-
ployee of the Black Eagle Coal Company, involves his
ceasing to work by reason of hypertension, it appearing
from the certificate of the physician, dated December 2,
1947, that Jackson had hypertension, was unable to work
in the mines, and his claim for benefits was filed Decem-
ber 3, 1947. The claim of Cora B. Sperry, filed November
21, 1946, grows out of the fact that a physician advised
her that if she continued to work for her employer, Jeff-
rey DeWitt Insulator Corporation, she might contract
tuberculosis by reason of dust conditions in her working
place. There is no claim that any one of the employers

was at fault in connection with the circumstances which caused the claimants to cease work.

The first question to be dealt with is that raised by counsel for the Pocahontas Fuel Corporation as to the right of the Director of Unemployment Compensation to prosecute this appeal.

A judicial review was provided for by Section 22 of Article 7 of Chapter 1, Acts of the Legislature, Second Extraordinary Session, 1936. This section was amended in 1939, and finally in 1943, and the section as so amended reads:

> "Within twenty days after decision of the board has become final, (referring to the Board of Review provided for in the Act) any party aggrieved may secure judicial review of the decision by commencing an action against the board in the circuit court of Kanawha county. Parties to the proceedings before the board shall be made defendants. The director shall be a necessary party to such judicial review."

The director mentioned in the above section refers to the Director of Unemployment Compensation.

We think that this section should be construed as authorizing the Director to prosecute an appeal from the action of the Board of Review to the Circuit Court of Kanawha County, and from that court to this Court, the appeal procedure being by writ of certiorari. The Director is responsible for the administration of the department, and of the fund committed to his care; and just as he would have the right to prosecute appeals in order to protect the fund, he is, we think, entitled to prosecute appeals to bring about what he believes to be a fair and correct interpretation of the statutes under which he operates. The statute is somewhat indefinite on this point, but we think sound administration of the fund requires that the Director be given the right to bring about an interpretation of the statute in doubtful cases such as those now presented on this appeal.

Our decision in these cases depends almost, if not entirely, on our construction of Section 4-1 of Article 6 of Chapter 1, Acts of the Legislature, Extraordinary Session, 1936, as last amended by Chapter 130, Acts of the Legislature, 1945. As an aid to that construction we think it advisable to trace the section from the date of its origin to the present. In the original 1936 Act, the section reads:

"Upon the determination of the facts by the director or his deputy, an individual shall be disqualified for benefits: (1) For the week in which he left work voluntarily without good cause and for not less than one nor more than five weeks which immediately follow."

The Act was amended by Chapter 134, Acts of the Legislature, 1939, and made to read:

"Upon the determination of the facts by the director an individual shall be disqualified for benefits: (1) For the week in which he left work voluntarily without good cause and for three weeks which immediately follow; * * *."

It was amended by Chapter 97, Acts of the Legislature, 1941 and as amended reads:

"Upon the determination of the facts by the director an individual shall be disqualified for benefits: (1) For the six weeks immediately following the date on which he left work voluntarily without good cause * * *."

It was amended by Chapter 76, Acts of the Legislature, 1943, and made to read:

"Upon the determination of the facts by the director, an individual shall be disqualified for benefits: (1) For the week in which he left work voluntarily without good cause involving fault on the part of employer and the six weeks immediately following such week * * *."

By Chapter 130, Acts of the Legislature, 1945, it was finally amended to read:

"Upon the determination of the facts by the director, an individual shall be disqualified for benefits: (1) For the week in which he left his most recent work voluntarily without good cause involving fault on the part of employer and the six weeks immediately following such week * * * *."

It will be noted that in the 1943 amendment there was added, after the words "good cause", the following words: *"involving fault on the part of employer"*, (emphasis ours) and the statute as it now exists clearly requires that the good cause for which a person may voluntarily quit work, must involve some fault on the part of the employer. That is the contention of the employers in these cases, and is not seriously controverted by the State.

As noted above, the 1943 amendment inserted the words which created this controversy. We will not undertake to inquire into the reasons for the insertion of these words, but evidently they were placed there for some purpose, and can not be ignored. That it was the intent of the Legislature to keep those words in the statute is attested by the fact, as admitted on argument, that the 1945 Legislature, in its regular session, amended Section 4-1 by Senate Bill Number 182, and the bill as passed by the State Senate eliminated the words "involving fault on the part of the employer". However, they were reinserted in the House of Delegates and the effort to delete them failed. While not controlling, this action of the Legislature plainly indicates that these words were calculated to serve some purpose, and we think the Court should be slow to give the act a construction different from that which its terms plainly import. We stated nothing new when we held in *Baird-Gatzmer Corporation v. Henry Clay Coal Mining Co.*, 131 W. Va. 793, 50 S.E. (2d) 673, that:

"This and other courts will always endeavor to give effect to what they consider the Legislative intent; but, we do not change plain and simple language employed in framing a statute unless there is an impelling reason for so doing."

If we understand the position of the State, acting through its Director of Unemployment Compensation, it does not question the correctness of the Circuit Court's ruling, had the same been applied to a case where there was a voluntary giving up of work by an employee, and where the employer was not at fault. The complaint is that the act was interpreted by the Board of Review, and the Circuit Court of Kanawha County, as providing that the cessation of work for reasons of health was a voluntary act, and being so, qualifications for benefits under the Act could be established only by a showing of some fault on the part of the employer. The State contends that when an employee quits work because of illness, his cessation of work is involuntary, and forced by circumstances over which he may, in many instances, have no control, and on these contentions it rests its case. Aside from the suggestion of the social responsibility involved, a matter which the Legislature, and not this Court, must determine, we can see no other basis for the State's contention.

The language of the statute is plain and unambiguous. The word "voluntarily" has a well defined meaning. It applies to the free exercise of the will. In the three cases before us, the claimant, in each instance, ceased to work, either on account of an actual state of poor health, or from fear that further work would endanger health. In one instance, the claimant was suffering from hypentersion which, as we understand, is another name for high blood pressure; in another, he had a potentially dangerous bladder condition; and in the other, the fear that continuation of work in that particular employment might bring about tuberculosis. Each of the parties was eligible for work immediately before they ceased to work; and if, at the time they ceased to work and thereafter, they were unable to perform work, they automatically became ineligible for benefits. Under Subsection 3 of Section 1 of Article 6 of the controlling statute, to be eligible to work one must be able to work and available for full time work for which he is fitted by prior training and experience. We do not understand it to be contended that either Alex Witt or Ed

Jackson were eligible for work during the seven weeks for which, if eligible for work, they might have been disqualified on account of having voluntarily ceased to work. In the case of Cora B. Sperry, there is nothing in the record to indicate that she could not have continued to work, and was, therefore, eligible to work. Having ceased work voluntarily, she disqualified herself under the plain provisions of the statute. If either Jackson or Witt had been restored to health during the seven weeks period following their ceasing to work, Section 4-1 would have disqualified them from benefits for the six weeks of disqualification provided for in the statute.

In whatever way we view this case, claimants are not entitled to benefits. If they were ill and unable to work, they were not eligible to work, and, therefore, not entitled to benefits. If they were eligible to work by reason of being able for full time work, they were disqualified under Section 4-1 of the statute. We do not understand the State's position to be at variance with our holding, except on the theory that in these cases the cessation of work was not voluntary. Its contention on that point has been stated. It is conceded by the State that so long as illness exists an employee is ineligible for benefits; but it claims that in such circumstances there should be no disqualification. Whatever merit there may be in this contention from a social viewpoint, it is not warranted by the statute as written; and this Court must apply statutes as written, and, in doing so, endeavor to apply them in accordance with legislative intent. It seems to us quite apparent that what the Legislature has intended was to guard against the abuses which might arise from permitting employees to voluntarily quit work on account of real or fancied ailments, and still be in position to apply for and receive benefits from the unemployment compensation fund. We think it fair to assume that the purpose of the Unemployment Compensation Act of 1936 was to encourage employment, because upon employment and the wages paid to employees depends the solvency of the fund built up for the protection of employees against the risks of unemploy-

ment. Any interpretation of the act, which encourages people not to work, can scarcely be considered as having been within the intent of the Legislature or of the proponents of the unemployment compensation system. If we should place upon the act the construction contended for by the State, we would, to some extent, convert the fund into a species of health insurance, and, this we are certain, the Legislature never intended.

In *Amherst Coal Company v. Hix,* 128 W. Va. 119, 35 S.E. (2d) 733, we had Section 4-1 under consideration, in a case where a coal miner had quit work on account of conditions in the mine unsatisfactory to him, but not due to fault on the part of the employer. We there held:

> "Customary working conditions not involving deceit or other wrongful conduct on the part of the employer are not a sufficient reason for an employee to leave his most recent work voluntarily under the provisions of Chapter 1, Article 6, Section 4 (1), Acts 2nd Extraordinary Session, 1936, as amended by Chapter 76, Acts 1943."

We interpret the *Amherst* case as sustaining our construction of the section involved in the case at bar.

The order of the Circuit Court of Kanawha County in each of the above styled cases is affirmed.

*Affirmed.*

RILEY, JUDGE, dissenting:

With deference I am constrained to dissent from the majority decision in this case. The majority opinion, it seems to me, overlooks the fundamental concept upon which the Unemployment Compensation Act is based. The legislation embraced in this statute is remedial, and "should be liberally construed to the end that the benefits intended under the provisions of the act are received by employees." *Grant Contracting Co. v. Murphy,* 387 Ill. 137, 56 N.E. 2d 313, 316. See also: *Puget Sound Bridge &*

*Dredging Co. v. State Unemployment Compensation Commission,* 168 Ore. 614, 126 P. 2d 37; *Saunders v. Maryland Unemployment Compensation Board* (Md.) 53 A. 2d 579, 581; *Rochester Dairy Co. v. Christgau, Director, etc.,* 217 Minn. 461, 14 N.W. 2d 780, 783.

I agree with the reasoning of the Court in *Bigger v. Unemployment Compensation Commission,* 43 Del. 274, 46 A. 2d 137, 140, affirmed in 53 A. 2d, 761, that "Necessity requires a liberal construction of the provisions of the Unemployment [Compensation] Act in favor of the ones to be benefited thereunder; otherwise, the true reason for its enactment would in the main be ignored, and the purposes sought to be accomplished defeated." The order of the Superior Court in the *Bigger* case was affirmed by the Supreme Court of Delaware. 43 Del. 553, 52 Atl. 2d 761. "Eligibility" and "disqualification" are defined and determined in different sections of Article 6 of the Unemployment Compensation Act. The eligibility qualifications which must be fulfilled by the unemployed individual before he can become entitled to benefits are defined in Sections 1, 1-a, and 2 of Article 6. The grounds upon which an unemployed person may be disqualified are defined in Sections 4 to 7, inclusive, of Article 6. Essential as a jurisdictional requirement on the question of eligibility, the unemployed person seeking compensation must be able to work and be available for full-time work for which he is fitted by prior training and experience. The instant claimants because of physical disabilities are not able to work and are not available for full-time work for which they are fitted by prior training and experience. They are, therefore, ineligible during the time of such incapacity. The question of ineligibility does not arise in this case, as the majority opinion says, and as is admitted in the petitioners' briefs. The whole question is whether in the circumstances of this case the claimants, in addition to being ineligible, are disqualified under Section 4 (1) of Article 6, which provides:

> "Upon the determination of the facts by the director, an individual shall be disqualified for benefits:

(1) For the week in which he left his most recent work voluntarily without good cause, involving fault on the part of the employer, and the six weeks immediately following such week. Such disqualification shall carry a reduction in the maximum benefit amount equal to six times the individual's weekly benefit rate. However, if the claimant returns to work in covered employment during his benefit year the maximum benefit amount shall be increased by the amount of the decrease imposed under the disqualification."

In all deference, the majority opinion seems to draw, notwithstanding the separate sections of the statute, no distinction between the effect of the words ineligible and disqualification. In fact, in the second syllabus of the Court it is said: "If unable to work during such period, he [claimant] is ineligible to receive unemployment benefits; and if eligible therefor, he is disqualified under said section [Section 4(1)] to receive such benefits." This is indeed a non sequitur. It may be inquired by what stretch of the imagination can it be said that the two separate and distinct words "ineligible" and "disqualification" have the same meaning? Applying the reasoning of the majority opinion that this Court should give interpretation to every word and phrase of a statute, a postulate with which I agree, the terms "ineligible" and "disqualification" should be separately interpreted in the light of the particular sections of the statute, in which they are embraced, and by such interpretation the correct legislative intent should be ascertained. The burdens of Section 4(1) of Article 6, which accompany disqualification, bear heavily on a claimant. If a claimant is disqualified "the disqualification shall carry a reduction in the maximum benefit amount equal to six times the individual's weekly benefit rate", and, for this reason, care should be taken in the determination whether the instant claimants are, in fact, disqualified.

Section 4(1) provides for disqualification if a claimant "left his most recent work *voluntarily without good cause*

*involving fault on the part of the employer."* (Italics supplied.) The majority opinion seems to assert that the claimants come within the foregoing provision of the statute. But in order to make affirmative showing of disqualification, it must be shown that claimant left his most recent work voluntarily without good cause involving fault on the part of the employer. As a corollary, if the claimants here left their work involuntarily, they do not come within the provision of the statute immediately under consideration, and it matters not whether the employer is at fault.

This brings me to the point where I necessarily diverge from the majority opinion. Because these claimants were incapacitated for work and were forced to leave their most recent work, they left that work involuntarily and an essential element of disqualification is absent. A statute must, as suggested in the majority opinion, be construed as a whole, and every word in it made effective, if possible. *State v. Jackson,* 120 W. Va. 521, 199 S. E. 876; *State ex rel Churchman v. Hall,* 86 W. Va. 1, 102 S. E. 694. To the effect that a claimant who necessarily leaves his employment because of ill health does not do so voluntarily, see *Bliley Electric Co. v. Unemployment Compensation Board of Review,* 158 P. Super. 548, 560, 562, 45 A. 2d 898, 904. In an article entitled Unemployment Compensation, 55 Yale Law Journal, page 155, it is said: "It is clear that a leaving is not voluntary where a worker has no choice but to sever his employment, as, for example, where the leaving is necessary to comply with a governmental regulation, or when the worker has suffered an incapacitating illness or accident and is unable to obtain a leave of absence." Here claimants had no reasonable choice by virtue of their respective incapacities: they were unable to work, therefore, they were ineligible to work, but ineligibility did not *per se* place on them the stigma of disqualification.

I have already discussed in a general way the necessity for liberally interpreting social statutes such as the one under consideration here. Such interpretation is necessary in order that benefits may be given to those reasonably entitled thereto, and, unless such interpretation is made,

consonant with the solvency of the fund, the fund is apt to grow, as the present unemployment fund has grown, yearly from its very inception to approximately eighty-nine million dollars; and the money so held, though, being administered, if unused, is in truth and in fact dead money. It is not to the interest of the people generally or of good government to have money thus kept from the channels of trade. This thought is embraced by an eminent American statesmen. In addressing the Congress of the United States, Grover Cleveland, then President of the United States, on December 6, 1887, invited attention to the then increasing concentration of money in the national treasury. He said: "This condition of our Treasury is not altogether new, and it has more than once of late been submitted to the peoples' representatives in the Congress, who alone can apply a remedy. And yet the situation still continues, with aggravated incidents, more than ever presaging financial convulsion and widespread disaster." He continues: "Though the situation thus far considered is fraught with danger which should be fully realized, and though it presents features of wrong to the people as well as peril to the country, it is but a result growing out of a perfectly palpable and apparent cause, constantly reproducing the same alarming circumstances — a congested National Treasury and a depleted monetary condition in the business of the country." So, I think, keeping in mind the solvency of the fund, the size thereof is such that a liberal construction of the statute, without destroying the concept of good government, is not out of place.

For the foregoing reasons, I would reverse the judgment of the Circuit Court of Kanawha County to the extent that it held that claimants were disqualified.

KENNA, JUDGE, dissenting:

In my opinion the decision of these cases does not turn upon the application of Section 4, Article 6, Chapter 130 of the Acts of the Legislature of 1945, providing that certain claimants for unemployment compensation shall be

considered disqualified and providing further the period during which the disqualification shall last. This section does not attempt to provide the persons who shall *receive* unemployment compensation, but does suspend payments under the act to those awarded benefits, for different causes and for varying numbers of weeks. Section 1 of this article defines those who shall be eligible to receive benefits, making it clear that no others under any circumstances or conditions shall become beneficiaries under the act. Subsection 3 of Section 1 reads as follows: If "He is able to work and is available for full time work for which he is fitted by prior training or experience." Viewing the act as a whole, it is quite plain that the term "able to work" means able to follow the customary occupation of the claimant. Otherwise the person involved is not "available for full time work" as provided. Conceding the *bona fides* of these claims, the claimants are not able to work within the meaning of the act.

In my opinion it is perfectly plain that the article providing for eligibility in its first section and for disqualification in its fourth, is intended (1) to preclude other than eligible persons from claiming under the act and (2) to *limit* payments to those who *are* eligible where, "upon the determination of the facts", the proof shows the claimant to be disqualified for one of the different periods stated in Section 4.

For the foregoing reason it is my opinion that none of these claimants has brought himself or herself within the classification of eligible claimants under the act and therefore is entitled to the payment of no benefits even after the expiration of the disqualification periods spoken of in the Court's opinion.