TERRA UTILITIES, INC., a corporation, Plaintiff,

v.

PUBLIC SERVICE COMMISSION of Utah and Milly O. Bernard, Olof E. Zundel, and Joseph C. Foley, Commissioners of the Public Service Commission of Utah, Defendants.

No. 14747.

Supreme Court of Utah.

Feb. 6, 1978.

Verl R. Topham, Randall Dunn, Daniel L. Berman, Richard D. Burbidge, Raymond J. Etcheverry of Berman & Giauque, Salt Lake City, for plaintiff.

Vernon B. Romney, Atty. Gen., G. Blaine Davis, Asst. Atty. Gen., Salt Lake City, for defendants.

MAUGHAN, Justice:

Plaintiff, a public utility, appeals from an order of the Public Service Commission. The order rejected a proposed rate increase for water and sewer services. We affirm the order. No costs awarded. All statutory references are to U.C.A.1953.

Plaintiff renders services to an area known as Bloomington, which is situated south of St. George, Utah. Plaintiff is completely owned by Terracor, the developer of Bloomington, a totally planned, independent community. Since the community started from the bare desert floor, there were no water or sewer services available. Terracor realized that during the early years of development, the revenue from the services furnished would be insufficient to pay the costs of operation, and it would be necessary to subsidize the facilities. It believed a private utility company was the best vehicle to provide the large amount of capital needed for the installation of the water and sewer systems for the development. Plaintiff was organized to fulfill this purpose.

Terracor owns all the stock in plaintiff and has supplied all of the debt capital. The total cost of the water and sewer systems is approximately $1,178,921, of this amount $418,724 represents equity capital invested by Terracor. Plaintiff owes Terracor $760,197, which is evidenced by a note and mortgage, payable over a period of forty years. Under the note, plaintiff was to commence paying interest on January 1, 1976. Only interest payments are required from 1976 to 1981. Beginning in 1982, the remaining thirty-five installments must retire the entire obligation including principal and interest.

In April 1975, plaintiff filed a schedule of proposed rates, a hearing was held in April, 1976. Plaintiff claimed that it needed approximately $36,985 in additional revenue to cover its expenses and the interest on its debt. Its income statement indicated a net loss of $28,734 for 1975.

Plaintiff's president testified that the rate of new home construction had been somewhat slower than anticipated; and, therefore, the utility had not become the self-sustaining venture as originally envisioned. He stated that in short, the enormous subsidization had continued longer than anticipated and at a considerable cost to the parent company.

Bloomington is essentially divided into two separate developments. One area is known as the Gardens, Ranches, and Country Club, hereinafter referred to as B–1. The other area is a new development known as Bloomington Hills, and hereinafter referred to as B–2. In B–1 there are approximately 1,479 lots; all but 26 of which have been sold.

At the time of plaintiff's application for a rate increase in April 1975, there were approximately 210 homes, 91 condominium units, and a country club located in B–1. These dwellings were situated throughout the development. The lots have been sold to individuals, who in their discretion, may build homes. There are approximately fifty new homes built each year. Terracor has completed all the improvements in B–1, including the hard surfacing of the streets. The water and sewer systems include laterals to each lot so it will be unnecessary to dig up the street when a new home is constructed.

In B–2, the development has not been completed, although all but 64 of the 1,486 lots have been sold. There are approximately ten customers in B–2, who receive water and sewer services from plaintiff. Plaintiff has not included the capital improvements in B–2 in the rate base for purposes of the proposed rate increase.

Plaintiff entered into two separate contracts with the City of St. George to provide water. One contract is for water for B–1, and the other is for B–2.

Under these contracts plaintiff is compelled to pay for a certain minimum number of gallons whether it uses the water or not. The minimum number of gallons increases each year, and in 1975 plaintiff paid $41,636 for water under both of these contracts. This water far exceeded the amount needed by plaintiff's present customers. The contracts further provide that if Bloomington is annexed to St. George, the water system will become the property of the city, free of debt or lien, and without cost to the city.

The central issue before the Commission was how should the utility rate base be calculated. Plaintiff urged that all of the capital improvements in B–1 should be included. Testifying in opposition to plaintiff's position was Clayton S. Hogstrom, a utility rate engineer in the Department of Business Regulation, Division of Public Utilities. The order of the Commission was based on the evidence and theory presented by Mr. Hogstrom.

Mr. Hogstrom testified that, on the surface, plaintiff's request for a rate increase appeared reasonable; for the financial statement indicated plaintiff was operating at a loss. The requested increase did not provide for a profit but merely sought to diminish the rate of loss. Mr. Hogstrom's investigation revealed the reason the utility was operating at a loss was because the system was currently overbuilt. He explained the present system was designed to serve 1,479 total units, of which 132 will be condominiums. All of the units will have water hookups and 1,170 will have sewer hookups (309 units will have septic tanks). As of December 31, 1975, there were 332 water hookups and 247 sewer hookups. Plaintiff was seeking to break even with a twenty percent occupancy; it was his opinion it is unfair to require a small number of customers to pay for a system designed to serve a group of customers about five times larger.

Mr. Hogstrom explained that an exhibit of plaintiffs indicated 632 water hookups were anticipated by 1983 (43% occupancy). If the rate of occupancy increases as indicated, by the exhibit, the project will not be filled until 1996.

Since the system was presently overbuilt, Mr. Hogstrom proposed a method to designate a portion of the total plant as used and useful. Such is defined, as that portion of the system required to serve present customers. The rate of return is calculated on this reduced rate base. If the rate base is reduced by this method, plaintiff shows a rate of return comparable with other water utilities. Based thereon, Mr. Hogstrom recommended the Commission disallow the proposed rate increase.

Mr. Hogstrom calculated the income, the asset values, the expenses, and the depreciation, if B–1 were entirely occupied. He determined that, if the services of the utility were being fully utilized, it would have a rate base of $1,096,540.17. He further produced a graph which indicated plaintiff would have a break-even point when it had 700 to 800 customers. It was his opinion plaintiff was presently in a loss position not because of a tariff deficiency, but because of a customer deficiency.

Mr. Hogstrom calculated the portion of the water system that was used and useful as 20.76% and that of the sewer system as 19.83%. He calculated the rate base as $219,061, which is 20.60% of $1,063,328, the rate base claimed by plaintiff. He further apportioned the interest and depreciation expenses. He determined the costs and expenses for the system, when properly apportioned, were $36,779. The income was $49,-225. Under these calculations, plaintiff received an 8.54% return on the rate base, and a 21.73% return on equity. He further determined that if the proposed rate increase were granted, plaintiff would receive a 27.42% return on the rate base and a 95.51% rate of return on the equity. He concluded the proposed rates were not just and reasonable and should be denied.

Another point of serious contention was whether the present customers should pay the $41,636 expense for water incurred under the two contracts between plaintiff and St. George. Of this total expense, $16,200 is for the minimum required under the con-

tract for water for B-2, which has only eight or nine water customers. Mr. Hogstrom expressed the opinion that none of the expense under the B-2 contract was used or useful and should be disqualified in determining plaintiff's expenses for rate purposes. He did not think these present costs should be passed on to the current customers. These costs should be borne by the developer, Terracor, which is the sole shareholder of plaintiff.

Mr. Hogstrom calculated the cost of the water actually sold to the homes and condominiums and determined the cost to supply water to existing customers was $13,645. The amounts in excess of this sum were due to the minimums required under the contract and did not reflect the use by existing customers. The cost for water for B-1 was $24,750. The difference of $11,105 was due to the fact the occupancy rate of the lots had not kept up with the required minimum purchases.

The Commission found a new business venture cannot be expected to return a profit in its initial stages, and that Terracor should not be permitted to pass a portion of its business risk onto plaintiff; but should bear the loss as the developer. The unavailability of revenue due to a lack of utility customers constituted part of that risk. The Commission further found that in order to remove that element of risk from plaintiff, the proposed used and useful ratio was just and reasonable. This method was further found reasonable because it was self-adjusting, viz., as customers are added, the revenues and rate base increase, and the rate of return remains constant. The Commission also found the ratio, defined as average customers through 1975 divided by a possible 1,479 customers, was a just and reasonable method of calculating a used and useful ratio.

The commission adopted the used and useful approach to setting rates for plaintiff and adopted the calculated rate base set forth in an exhibit by Mr. Hogstrom. The

Commission found a return on the calculated rate base of 8.54% and a return on equity of 21.73%, which it found just and reasonable. The Commission ordered the proposed tariffs rejected and the existing tariffs retained without change.

Before assessing plaintiff's arguments, the limited role of this court in review of a rate making case should be set forth.

54-7-16, provides:

. . . The review shall not be extended further than to determine whether the commission has regularly pursued its authority, including a determination of whether the order or decision under review violates any right of the petitioner under the Constitution of the United States or of the state of Utah. The findings and conclusions of the commission on questions of fact shall be final and shall not be subject to review. Such questions of fact shall include ultimate facts and the findings and conclusions of the commission on reasonableness and discrimination. . . .

The regulation and establishment of rates is strictly a legislative power, and the Commission acts in these matters, as an arm of the legislature. This court may not interfere with or review a legislative act unless some judicial question is presented for review. Unless a rate established by the Commission is clearly oppressive or confiscatory, no judicial question is presented. Whether there is any substantial evidence to support a finding of fact made by the Commission is a judicial question and may be determined by this court. Thus all this court can review in this case is whether there is any evidence to sustain the findings of the Commission, whether it has exercised its authority according to law, and whether any of plaintiff's constitutional rights have been invaded or disregarded.[1]

Plaintiff contends the exclusion of approximately eighty percent of the capital improvements from the rate base constituted an unconstitutional deprivation of prop-

---

1. *Salt Lake City v. Utah Light and Traction Company*, 52 Utah 210, 227–228, 173 P. 556 (1918).

erty in violation of the state and federal constitutions.

■ Insofar as federal constitutional limitations are concerned, so long as the rate set does not confiscate the property devoted to public service, the rate order will not be held to violate substantive constitutional principles. In fixing rates, the legislature is free to determine its own economic policy.[2] Since the due process clause of our state Constitution (Article I, Section 7) is substantially similar to the Fifth and Fourteenth Amendments to the federal Constitution, the decisions of the Supreme Court of the United States on the federal due process clauses are highly persuasive as to the application of that clause of our state Constitution.[3]

In *San Diego Land and Town Company v. Jasper*[4] the court stated:

. . . If a plant is built, as probably this was, for a larger area than it finds itself able to supply, or, apart from that, if it does not, as yet, have the customers contemplated, neither justice nor the Constitution requires that, say, two thirds of the contemplated number should pay a full return. . . .

. . . The statute of California no doubt was contemplating the case of waterworks fully occupied within the area which they intended to supply. It hardly can have meant that a system constructed for 6,000 acres should have a full return upon its value from 500, if those were all that it supplied. At all events, we will not be the first to say so. If necessary to avoid that result, we should assume that only a proportionate part of the system was actually used and useful within the meaning of the statute. Upon the whole case we are unable to say that the circuit court should have de-

clared the rates confiscatory. . . . If the original company embarked upon a great speculation which has not turned out as expected, more modest valuations are a result to which it must make up its mind.

■ Plaintiff contends, its entire system is devoted to public use, and the Commission's unorthodox application of the used and useful principle had the effect of a confiscation; by denying plaintiff a fair return on its property. It points out that water is flowing in the pipes throughout the system. It claims it used good business judgment by completing the entire system, and it would have been uneconomical to install a smaller system, thus requiring enlargement as the number of customers increased.

In *Fern Lake Company v. Public Service Commission*[5] the court stated that where there is evidence a water system was designed to serve an expected population far greater than the number of customers it has ever had and its facilities are far in excess of those needed, the excess facilities are not used or useful so as to be a proper factor in establishing a rate base. The court stated:

. . . Furthermore, as a matter of law, we believe the Commission properly refused to include the cost of over-adequate facilities in the rate base. . . .[6]

■ Plaintiff also contends the Commission exceeded its authority by attempting to exercise jurisdiction over Terracor, a nonutility, to sustain such an allegation, plaintiff cites the findings and conclusion that Terracor must bear the risk of loss as the developer of the project.

In answer to this we call attention to *United Gas Pipe Line Company v. Louisiana*

2. *Utah Power and Light Company v. Public Service Commission*, 107 Utah 155, 179, 152 P.2d 542 (1944).

3. *Untermyer v. State Tax Commission*, 102 Utah 214, 222–223, 129 P.2d 881 (1942).

4. 189 U.S. 439, 446–447, 23 S.Ct. 571, 47 L.Ed. 892 (1903).

5. Ky., 357 S.W.2d 701, 704–705 (1962).

6. Also see *L. B. Herr, Jr. v. Lancaster Suburban Water Company*, 14 P.U.R. (N.S.) 369, 385 (1936); *Re Cascade Town Company*, 80 P.U.R. (N.S.) 102, 105 (1949).

*Public Service Commission.*[7] There it was observed the fixing of rates involves a delicate balancing of consumer and investor interests. The problem of a fair return is one of economics and involves the application of a fair rate of return to a fairly constructed rate base.

> . . . It is well established that, in making a determination of costs for rate purposes, the reviewing Commission may look through the corporate form of affiliated corporations and probe for economic realities.[8]

Plaintiff argues there was no substantial evidence to sustain the findings. A similar argument was advanced in *New England Tel. & Tel. Co. v. State*[9] wherein it was urged the commission had disregarded the actual capital structure of the company and substituted a hypothetical structure without warrant in the evidence. The Commission had adopted the recommendations of an expert witness called by the state in determination of a reasonable capital structure. The witnesses for the company based their testimony on the capital structure as it actually existed. The court stated:

> Whether the Commission should rely upon the expert testimony presented by the State in preference to that offered by the Company or vice versa cannot be decided as a matter of law. It is a matter for its judgment based upon the evidence, . . . .

Plaintiff has not sustained its burden to justify an increase in rates.

ELLETT, C. J., and CROCKETT, J., concur.

HALL, J., concurs in result.

WILKINS, J., does not participate herein.

**7.** 241 La. 687, 707, 130 So.2d 652, 658, 660 (1961).

**8.** See *Utah Power and Light Company v. Public Service Commission*, 107 Utah 155, 192–196, 152 P.2d 542 (1944), wherein this court sustained the ruling of the Commission that profits paid to an affiliate company would be excluded

from the rate base. The Commission may disregard the corporate entities of various affiliate corporations and consider the substance of the matter.

**9.** N.H., 97 A.2d 213, 221 (1953).