UTAH DEPARTMENT OF BUSINESS REGULATION, DIVISION OF PUBLIC UTILITIES, Plaintiff,

v.

PUBLIC SERVICE COMMISSION of Utah; Milly O. Bernard, Chairman; Olof E. Zundel, Commissioner; and Kenneth Rigtrup, Commissioner, Defendants.

Mountain Fuel Supply Company, a Utah Corporation, Intervenor and Defendant.

No. 16241.

Supreme Court of Utah.

June 19, 1980.

**1243**

for natural gas sold by Mountain Fuel Supply Company. The order is reversed and remanded to the P.S.C.

The order was the result of the two applications for a rate increase equal to a company-wide wage increase of six percent given to all employees, except officers and directors, and a five percent increase given to Wyoming and Colorado employees, which was in addition to the general wage increase. For the general wage increase, the Company established a test year beginning July 1, 1978. For the additional wage increase for Colorado and Wyoming, the test year commenced August 1, 1978. Approximately 81.3% of the general wage increase was allocated to Utah and 79% of the additional increase was so allocated. Mountain Fuel, pursuant to a general rate hearing, had been granted an increase in an order of the P.S.C., dated December 31, 1977, which was based on a test year from April 1, 1977 to March 31, 1978. Subsequently, an additional increase equal to an increase in fuel costs had been passed through to the rate payers. In its application Mountain Fuel referred to its last general rate increase and stated:

". . . No projection involved in the determination of just and reasonable rates was made beyond the test year and no increases in costs of Company operations beyond that period were included."

In its application Mountain Fuel asserted it was necessary it be permitted to reflect in its rates some of the additional direct increases in the salaries of its employees in order to maintain the financial integrity of the company. It asserted it did not seek to increase its net earnings or enhance the rate of return established in the prior general rate case.

It was the position of Mountain Fuel, which was accepted by the majority of the members of the P.S.C., this rate increase could be determined in a summary type of proceeding, without an examination of the many factors usually associated with a rate increase hearing. The company sought to recover in the rates on a dollar for dollar basis the cost of the wage and salary increase of its employees.

Robert B. Hansen, Atty. Gen., Stephen R. Randle, Asst. Atty. Gen., Salt Lake City, for appellant.

Robert S. Campbell, Gregory B. Monson, R. G. Groussman, Salt Lake City, for respondent.

MAUGHAN, Justice:

This is a proceeding to review an order of the Public Service Commission (P.S.C.) authorizing a $1,599,412.00 increase in rates

David N. Rose, an executive of Mountain Fuel, testified the company was allowed a 9.55% rate of return in the general rate increase order of December, 1977. He asserted (no documentary evidence with the figures upon which he based the computations was proffered into evidence), the rate of return in May, 1978, was 8.5%; in June, 8.2%; in July, 8%. He testified 8% was not a reasonable and adequate rate of return. In support of its application, Mountain Fuel did not include any figures or evidence in regard to its costs of capital, rate base, current earnings, or a cost of service study covering this increase. One witness of the company was not sure whether there had been an increase in industrial customers with a consequent increase in revenues since the prior rate case. A witness for the company testified he did not *believe* a further study of any factors was needed, to determine an increase in the rates was justified. The witness testified it was *his understanding* revenues had not changed from the test period in the pass-through case; they had neither greatly increased or decreased. In regard to residential users, the witness *had an impression* that usage was close to past forecast test years. The witness was asked how did the Commission know the increase would not change the net earnings or enhance the rate of return? He responded that the company *had estimated* the costs had gone up and had requested an offsetting increase. He *felt* it was a one to one relationship. The company did not present any earnings figures in evidence for the reason the rate of return testimony indicated the earnings.

The Division of Public Utilities (the Division) filed motions prior to and at the conclusion of the hearing to dismiss the application. The Division urged there was no statutory authorization to pass-through wage costs—a single item of the costs of service in establishing rates and charges for a public utility. In its post-hearing motion the Division said no evidence had been received with respect to current revenues and cost of service on a "normalized" test year basis. Also, it said, no evidence was presented as to the company's present cost

of capital or present "normalized" rate base, dedicated to rendering service within Utah. The only evidence concerning operations was the past rate of return, which was for the total company and was not normalized or temperature adjusted. The Division urged there was no evidentiary basis upon which the P.S.C. could make a finding, or even determine initially the present rates were insufficient—a finding required under Section 54–4–4(1).

In its findings the P.S.C. recited the testimony of the officer of Mountain Fuel concerning the rate of return and described it as uncontroverted evidence. The P.S.C. found the company's current rate of return as approximately 8%, and that such was not an unreasonably high return on the rate base, given current market conditions. The finding further stated, if the company were required to absorb the cost increases, the return would be further reduced and would be insufficient. The P.S.C. concluded the wage increases were reasonably incurred expenses; the Company was currently earning a rate of return on rate base which was not unreasonably high; and the Company had established a prima facie case unchallenged by any party, viz., the return to be earned if the applications were granted would not be unreasonable.

In a dissent, Commissioner Rigtrup pointed out Mountain Fuel did not present evidence of a test year rate base, i. e., the plant utilized in providing natural gas service to its customers. No evidence was presented as to its current capital structure and the cost of capital in the current capital markets. No evidence was presented as to its projections of its other expenses and its revenues during the selected test year. The dissent observed current capital market conditions were not explored by applicant and thus there was no evidence in the record to support the finding the return of 8% was not unreasonably high on rate base given current market conditions.

The dissent stated reliance by the P.S.C. on a rate of return established in a prior proceeding almost one year previously was deemed to be an abuse of authority in *Utah*

*State Board of Regents v. Utah Public Service Commission.*[1] The dissent observed both expenses and various classes of revenue may vary. Productivity gains may be achieved. Without reviewing the numerous factors, it was difficult to determine just and reasonable rates. The dissent observed the Legislature contemplated a more thorough review of revenues, expenses, and investments in ascertaining just and reasonable rates.

The dissent further pointed out an apparent misapprehension of the majority of the P.S.C. concerning the burden of proof in establishing rates. The dissent cited the majority's conclusion of law, viz., Mountain Fuel had established a prima facie case unchallenged by any party, and stated:

". . . While the strict application of technical rules of evidence in a court of law may well dictate that a moving party meets its initial burden of proof by establishing a prima facie case, thereby shifting the burden of proof to the opposing party or parties, such a rule or practice should not apply before this administrative body. It seems clear to me that a reading of the various provisions of the Public Utilities Act would indicate that the burden of establishing 'just and reasonable' rates is upon the utility applying for rate relief. The Public Utilities Act does not permit this Commission to abdicate its day to day regulatory responsibilities simply because the Division of Public Utilities or interested parties intervening in rate proceedings do not challenge or question that which is improper, illegal, unfair, unjust, discriminatory or which is in any other fashion contrary to the rules and regulations or orders of this Commission or is contrary to the statutes of the State of Utah."

The dissent further acknowledged Mountain Fuel's claim that general rate cases were more costly and time consuming was not without merit, but admonished:

". . . A precedent is now created for over 300 utilities under the regulation of this Commission to file pass-through cases for an infinite number of identifiable expenses. Had the Legislature intended such a result, it would have specifically provided for a speedy, summary procedure to promptly pass along other costs in addition to fuel cost increases. Should the Order in these cases stand, I can foresee the ultimate disappearance of general rate cases before this Commission."

The dissent concluded the motion to dismiss should have been granted.

## BURDEN OF PROOF

■ The comments of the dissent as to the burden of proof were correct. The first prerequisite of a rate order is that it be preceded by a hearing and findings. At such a hearing the legislature intended there be evidence adduced which could reasonably be calculated to resolve the issue presented for determination, which in this case is a rate increase. The findings required by statute (of a just and reasonable rate, Section 54–7–12(2)) must be made in accordance with the evidence so presented. If there be no substantial evidence to support an essential finding, that finding cannot stand; and a rate order predicated upon it must fall.[2]

■ In the regulation of public utilities by governmental authority, a fundamental principle is: the burden rests heavily upon a utility to prove it is entitled to rate relief and not upon the commission, the commission staff, or any interested party or protestant; to prove the contrary.[3] A utility has the burden of proof to demonstrate its proposed increase in rates and charges is just and reasonable. The company must support its application by way of substantial evidence, and the mere filing of schedules and testimony in support of a rate increase

1. Utah, 583 P.2d 609 (1978).

2. *Mountain States Telephone & Telegraph Co. v. Public Service Commission,* 105 Utah 266, 271, 145 P.2d 790 (1944).

3. Re: *Southern California Gas Company,* 35 P.U.R.3d 300, 309 (1960).

is insufficient to sustain the burden.[4] Rate making is not an adversary proceeding in which the applicant needs only to present a prima facie case to be entitled to relief.[5] A state regulatory commission, whose powers have been invoked to fix a reasonable rate, is entitled to know and before it can act advisedly must be informed of all relevant facts. Otherwise, the hands of the regulatory body could be tied in such fashion it could not effectively determine whether a proposed rate was justified.[6] In accordance with the mandate of Section 54–7–12(2) (". . . On such hearing the commission shall establish the rates . . . which it shall find to be just and reasonable.") There must be substantial evidence to support the essential findings in a rate order. ". . . Whether there is any substantial evidence to support a finding of fact made by the Commission is a judicial question and may be determined by this court. . . ."[7]

## PROCEEDINGS TO ESTABLISH JUST AND REASONABLE RATES

■ Plaintiff contends there is no statutory authority for the P.S.C. to approve a rate increase based solely on evidence of an increase in a single category of costs. Plaintiff claims under the statutes, the P.S.C. must make a determination that the rates resulting from an increase are just and reasonable (Sections 54–4–4(1), and 54–7–12 (1) and (2)), and that such a finding must be based upon an examination of many factors, and cannot rest solely upon evidence of a change in wage and salary costs.

One of the most significant deficiencies in the order was the omission of any finding the new rates were just and reasonable. Mountain Fuel urges such a finding is implicit within the finding concerning the reasonableness of the rate of return, and the hearing involved nothing more than an abbreviated proceeding to adjust the rates by offsetting the costs of the wage increase. Mountain Fuel claims the P.S.C. relied on

its prior determinations in the general rate case order of December, 1977, where all the economic elements were thoroughly explored. This argument does not coincide with the facts in the record. First, in its application the company, in effect, put in issue the question of what constituted a just and reasonable rate beyond the test year of the general rate case, which terminated March 31, 1978. Second, this current order established a new test year, which involved an estimate of future costs, commencing in July and August 1978, without a determination as to whether the new rates were just and reasonable. [Section 54–4–4(1) and (3)]. In other words, when Mountain Fuel embarked on a new test year, projecting one item of expense, it was impossible to determine whether the rates were just and reasonable without consideration of the other factors involved in making such a determination.

This opinion will discuss infra the two alternative courses, which applicant might have undertaken, viz., an abbreviated or general rate making hearing and the requisites involved.

Mountain Fuel relies on the testimony of its witnesses, as summarized ante, to sustain the order; viz., there were no offsets for this anticipated expense and the current net income and rate of return would not be enhanced by the rate increase. This testimony was not supported by any cost of service study or other statistical evidence to sustain the bald assertions that all relevant factors in the rate-making process would remain constant under the future projections. Of particular significance was the testimony of the witness concerning the diminishing rate of return, there was no evidence presented as to the data upon which his computations were based. Yet, this was the only evidence in the record to support the finding of the P.S.C. that the company's current rate of return was ap-

---

**4.** Re: *Gas Company of New Mexico*, 28 P.U. R.4th 20, 23 (1978).

**5.** *Petition of Public Service Coordinated Transport*, 5 N.J. 196, 74 A.2d 580, 592 (1950).

**6.** Re: *San Gabriel Valley Water Company*, 1 P.U.R.3d 161, 163 (1953).

**7.** *Terra Utilities, Inc. v. Public Service Commission*, Utah, 575 P.2d 1029, 1032 (1978).

proximately 8%, which contrary to the claim of the witness that such a rate of return was not reasonable and adequate, the P.S.C. found, without any supporting evidence, not to be unreasonably high return on the rate base given current market conditions.

The meager evidence adduced is insufficient to sustain the findings of the P.S.C., i. e., there is no justification in the evidence of the facts found.[8]

". . . Some deference to management judgment is, of course, proper. The commission may not, however, defer to bald assertions by management. This is so particularly when more compelling evidence, in the form of economic and statistical analyses and comparisons of the type which can be committed to record and be available for analysis by the commission and by a reviewing court, can be developed at reasonable cost. . . ." [9]

Mountain Fuel urges the Public Utilities Act does not mandate any particular type of proceeding in a rate making hearing. Section 54–3–1 mandates all charges made by a public utility shall be just and reasonable. Section 54–4–4(1) mandates the commission shall determine just, reasonable or sufficient rates and shall fix the same by order. Chapter 7 of Title 54 contains the legislative enactments concerning hearings, practice, and procedure under the Public Utilities Act. 54–7–12(1) and (2), as amended in 1975 and 1976, concern the proceedings in the case of a rate increase. The amendments made some significant textual changes in subsection 1. Prior to the amendment subsection (1) provided:

"No public utility shall raise any rate . . . under any circumstances whatsoever, except upon a showing before the commission and a finding by the commission that such increase is justified."

Currently subsection (1) provides:

"No public utility shall raise any rate . . . under any circumstances whatsoever, except in the case of fuel cost increases to the utility by an independent source of supply, and then only upon a showing before the commission and a finding by the commission that such increase is justified; provided, however, that a public hearing be held within 30 days after the date of any tentative order issued by the commission allowing such fuel cost increase, or"

Subsection (2), as amended 1976, provides:

"Whenever there shall be filed with the commission any schedule stating a single or joint rate . . . increasing or resulting in an increase in any rate . . . the commission may either upon complaint, or upon its own initiative without complaint, upon reasonable notice, enter upon a hearing concerning the propriety of such rate . . . and pending the hearing and the decision thereon, such rate shall not go into effect; provided, that any rate . . . shall become final at the expiration of 120 days from the time when such rate . . . is filed with the commission. If hearings cannot reasonably be completed within said 120 days, the commission may in its discretion extend the period not exceeding an additional 120 days. In the event of such extension of time the commission may, by temporary order, allow any amount that has been fully justified pending the commission's final decision. On such hearing the commission shall establish the rates . . . which it shall find to be just and reasonable."

Under subsection (1), prior to amendment, no public utility could increase rates, under any circumstances without a proceeding before the commission in which the utility had the burden of proof to adduce substantial evidence upon which the commission could predicate a finding the increase was justified. Under subsection (1) prior to amendment, a proceeding was required, but the utility could take the initiative and expedite the matter. Under subsection (2), prior to amendment, a schedule increasing a rate could be filed, which if it

8. *PBI Freight Service v. Public Service Comm.*, Utah, 598 P.d 1352 (1979).

9. *State v. Jager*, Alaska, 537 P.2d 1100, 1113–1114 (1975).

were not suspended by the initiation of a hearing, would go into effect thirty days after the filing of the schedule, subject to the power of the commission, after hearing, to alter or modify the same.

By the amendments to subsection (1), the proceeding formerly provided thereunder was abolished. This subsection is currently devoted exclusively to the procedure for procuring a tentative order for a rate increase when there is a fuel cost increase by an independent supplier, viz., a pre-hearing increase may be granted based on submission of proof and a finding the increase is justified. However, there is a provision for a public hearing within 30 days after the issuance of the tentative order. Prior to amendment, the two subsections set forth two different types of procedure to effect a rate increase. The amended subsection (1) concludes with the disjunctive "or," which within the context of the relevant provisions, appears to integrate the two subsections into one procedure. The former provision in subsection (2), which permitted an unchallenged rate increase to go into effect 30 days after the new schedule was filed, was deleted by the legislature. The current statutory design appears to be directed towards ameliorating the problem of regulatory lag by permitting a pre-hearing tentative order for a fuel cost increase, and providing specific time limits in which a filing for a rate increase shall become final. However, there is one other aspect to the procedure, any time a hearing is required, the duty devolves upon the P.S.C. to set rates, "which it shall find to be just and reasonable."

■ A just and reasonable rate is one that is sufficient to permit the utility to recover its costs of service and a reasonable return on the value of property devoted to public use.[10] Thus, the type of proceeding (a general rate case or an abbreviated proceeding) which the P.S.C. must conduct depends on how the components involved in determining a just and reasonable rate affect that standard.

In *City of Los Angeles v. Public Utilities Commission*[11] the Court pointed out that the basic approach in rate making is to take a test year and determine the revenues, expenses, and investment for the test year. The test period results are adjusted to allow for reasonably anticipated changes in revenues, expenses, or other conditions in order that the test-period results of operations will be as nearly representative of future conditions as possible. The commission may adjust all figures, revenue, expense, and investment for anticipated changes, but it may not adjust one side or part of the equation without adjusting the other; unless there is a finding the particular expense is extraordinary. In other words, there is no basis for adjusting a test year figure in the absence of a finding the increased revenues expected in the future (adjusted to reflect new customers) will not be sufficient to offset the investment and other increased investment and expenses.

In determining a just and reasonable rate, the gross revenues should be of a sum to cover two distinct components, the operating expense and the return on invested capital. The return (the profit) is calculated solely on the rate base (the capital contributed by the investors); the utility is not entitled to earn an additional profit on its expenses but only to recover these costs on a dollar for dollar basis.[12] In a general rate proceeding the commission determines for a test period the expenses, the rate base, and the rate of return to be allowed. Based on those figures the commission determines the revenue requirements, then fixes a rate to produce sufficient income to meet the revenue requirements. Thereafter, when an item of expense varies disproportionate-

10. *Federal Power Commission v. Memphis Light, Gas and Water Division*, 411 U.S. 458, 466, 93 S.Ct. 1723, 1728, 36 L.Ed.2d 426 (1973); *Southern California Gas Company v. Public Utilities Commission*, 23 Cal.3d 470, 153 Cal. Rptr. 10, 591 P.2d 34, 37 (1979).

11. 7 Cal.3d 331, 102 Cal.Rptr. 313, 497 P.2d 785, 797 (1972).

12. *Southern California Edison Company v. Public Utilities Commission*, 20 Cal.3d 813, 144 Cal.Rptr. 905, 576 P.2d 945, 947 (1978).

ly to variations in other costs there may be an abbreviated proceeding (offset) to adjust rates. In an offset proceeding it is deemed to serve no useful purpose to recalculate all the factors involved in a general rate proceeding.[13]

The purpose of an offset proceeding is to permit a prompt rate adjustment to offset an unusual change in an expense such as fuel costs. Conceptually, it is erroneous to deem an offset proceeding as a miniature rate proceeding intended to generate whatever rates are deemed necessary to prevent decay in a utility's overall rate of return on invested capital. An offset proceeding is an expedited adjustment procedure to allow utility to recoup its costs, and not to insure that its authorized rate of return is actually earned.[14] Thus, in such a proceeding all factors are held constant except the specific items under review.[15]

If Mountain Fuel sought merely an offset proceeding, the testimony concerning the decay of its rate of return was irrelevant. The initiation of a new test year was inconsistent with the idea that a mere adjustment of the prior test year was sought, for all factors, not immediately involved with the specific elements under review, would remain constant. To be entitled to a rate adjustment, Mountain Fuel had the burden to prove the wage increase constituted an extraordinary expense, e. g., disproportionate in relation to anticipated expenses and gross revenues. Whether the salary increase was extraordinary would depend on whether the evidence indicated there had

been any adjustments in reference to productivity or efficiency gains, or whether this single expense item was offset by other factors in the company's operations, or both. The applicant should project any anticipated increase in revenues resulting from new hook-ups or increased consumption in evaluating productivity.[16]

In assessing applicant's claim for an adjustment the P.S.C. has the authority to assess the policy consideration involved, for an automatic adjustment of rates to reflect changes in the cost of partially controllable factors, such as wages and salaries, tends to result in the elimination of incentive of the utility to economize and to seek greater efficiency.[17]

■ In evaluating an application, the fundamental principle involved is that post-test-year adjustments to expenses must be matched with post-test-year revenue increases which might offset additional expenditures.[18] A claim for a post-test-year wage adjustment has been disallowed on the basis of a presumption of increased productivity and correspondingly increased revenues.[19] To be entitled to an adjustment for increased wage and salary expense the applicant must sustain its evidentiary burden to establish these payroll increases will not be offset by productivity and increased sales.[20]

■ In summary, there is no provision in the Public Utilities Act, which precludes the authority of the P.S.C. to conduct an abbre-

**13.** *California Manufacturer's Association v. Public Utilities Commission*, 155 Cal.Rptr. 664, 595 P.2d 98, 100–101 (1979).

**14.** *Southern California Gas Company v. Public Utilities Commission*, 23 Cal.3d 470, 153 Cal. Rptr. 10, 21, 591 P.2d 34, 44 (1979). The court cited as factors to sustain this position, First, a utility is not entitled to earn a profit on expenses. "Second, even its lawful profit was not guaranteed. A utility is entitled only to the opportunity to earn a reasonable return on its investment; the law does not insure that it will in fact earn the particular rate of return authorized by the commission, or indeed that it will earn any net [return]."

**15.** Id.

**16.** Re: *Intermountain Gas Company*, 26 P.U. R.4th 442, 458 (1978).

**17.** *Wisconsin's Environmental Decade, Inc. v. Public Service Commission*, 81 Wis.2d 344, 260 N.W.2d 712, 715 (1978); Re: *Utah Power & Light Company*, 95 P.U.R.N.S. 390, 399 (1952).

**18.** Re: *Southern California Edison Company*, 23 P.U.R.4th 44, 48 (1977).

**19.** Id.

**20.** Id.; Re: *Northern Public Service Company*, 22 P.U.R.4th 60, 79 (1977); *Pennsylvania Public Utility Commission v. T. W. Phillips Gas and Oil Company*, 26 P.U.R.4th 1, 13 (1978).

viated proceeding to adjust a utility rate or charge, but any rate so adjusted must be predicated upon a finding that such adjusted rate is just and reasonable. In turn, this finding must be supported by substantial evidence concerning every significant element in the rate making components (expense or investment) which is claimed by the applicant as the basis to justify a rate adjustment.

■ The Division further urges this Court to declare the order of the P.S.C. invalid and void from its inception, and to order the amounts collected thereunder to be refunded. To undertake such a course would be tantamount to this Court engaging in rate-making, which is strictly a legislative power, for the P.S.C. in fixing and promulgating rates acts merely as an arm of the Legislature. The review by this Court of the orders of the P.S.C. is confined to the legal issues of whether there is substantial evidence to sustain the findings of the P.S.C.; whether the P.S.C. has exercised its authority according to law; and whether any constitutional rights of a complaining party have been invaded or disregarded. Any interference by this Court beyond the aforementioned limits would constitute an interference with the law-making power of this state.[21] Thus, the order of the P.S.C. is set aside, and this matter is remanded to the P.S.C. to determine whether the adjustment sought by applicant would be a just and reasonable rate.

## STANDING OF THE DIVISION

Mountain Fuel attacks the standing of the Division of Public Utilities to bring this action.

Its analysis of the relevant statutory provisions fails to give the intended effect to Sections 13–1–1.1 and 13–1–1.3 on the functions of the P.S.C. These statutes are designed to separate the quasi-judicial and rule-making functions of the P.S.C. from its investigatory and prosecutorial functions, including the staffs' role to discover and present evidence as an advocate concerning the public interest.

The impact of these statutory provisions should be evaluated within the context of certain evolving administrative law principles concerning the separation of incompatible functions in administrative agencies. Many aspects of this subject are discussed in 2 Davis, Administrative Law Treatise, Chapter 13.[22]

The concept of separation of functions is a proposed solution to the problem of preventing contamination of judging by the performance of inconsistent functions; including prosecuting and investigating, instituting proceedings, negotiating settlements, and testifying. Many administrative agencies through the agency heads or staff or both perform all these various functions. The objective is to separate inconsistent functions in such a way as to protect the judging function.[23]

The problem of combined functions may be remedied by an appropriate internal division of labor, whereby those who hear and decide are insulated from all other phases of the case. The views of the agency's investigators and advocates should be presented only in open hearings where they can be known and met by those who may be adversely affected by them.[24] There is a need for separation in rate-making and related functions; those who prepare and present rate cases as advocates should not participate in judging; to the extent the staff is engaged in advocacy, the agency should not have unlimited access to the minds of the staff.[25] Another aspect, which should be considered in separating inconsistent functions, is the occurrence in an

21. *Terra Utilities, Inc. v. Public Service Commission*, Utah, 575 P.2d 1029 (1978); *Jeremy Fuel & Grain Co. v. Public Utilities Comm.*, 63 Utah 392, 226 P. 456 (1924); *Salt Lake City v. Utah Light & Traction Company*, 52 Utah 210, 173 P. 556 (1918).

22. Pages 171–249.

23. Id., Sec. 13.01, p. 171.

24. Id., Sec. 13.03, p. 186.

25. Id., Sec. 13.05, pp. 201–202.

agency of investigators, prosecutors, and judges having a common superior. Those who do the final judging should not have the responsibility for determining prosecuting policies. Furthermore, those who serve as judges should not consider investigators' reports and recommendations with respect to prosecution.[26]

Even though there is little concrete evidence of unfairness, there remains a belief in the impropriety of the combination of functions in an administrative agency. The separation of functions promotes attitudes of confidence and cooperation of the regulated parties.[27]

The Utah statutes, separating the functions of the P.S.C., avert certain problems, which arise under the A.P.A. Professor Davis explains:

> " . . . If, for instance, the Federal Power Commission is deciding a hard-fought question, on which conflicting evidence has been given, for the purpose of fixing for the future the rates of the X Company, nothing in the A.P.A. prevents members of the Commission's staff who have played the role of advocates from participating in the process of final decision, for under the Act rate fixing for the future is not adjudication . . . ." [28]

Another example cited by Davis was an acknowledgement by the Commissioners of the F.C.C. that the Commission's General Counsel, after trying to win a case as an advocate in a public proceeding, argued further before the Commission in an executive session in the absence of opposing counsel. Such a course of conduct was not in violation of the A.P.A. because the case involved an application for an initial license.[29] Such a procedure would not be countenanced under Utah statutes.

The Utah statutes share a common purpose with the A.P.A., but more effectively prevent the contamination of judging with either investigating or prosecuting. Where a case reaches the stage of hearing and formal adjudication, the person, who did the actual work of investigating and building the case, should play no part in the decision. This principle is supported by the rationale that an investigator, if allowed to participate, would be likely to interpolate facts and information discovered by him ex parte and not adduced at the hearing, where testimony is sworn and subject to cross-examination and rebuttal. In addition, an investigator's function may be partially that of a detective, whose purpose is to ferret out and establish a case. Such may produce a state of mind incompatible with objective impartiality, which is essential to the process of decision.[30]

Davis defines an advocate as one who tries to win a case by presenting evidence or argument. Davis urges that an advocate, whether or not he is a prosecutor, should be barred from participating in the judging function.[31] Davis is critical of the A.P.A., which limits separation of function requirements to adjudication and specifically classifies rate cases as rule making. He states: "A simple provision that an advocate may not participate in judging in any type of case would be appropriate, for no matter what the type of case may be, the same man should not try to win for one side and then help determine the extent of his own success." [32]

Davis, in his summary, observes it is generally accepted that judging should not be substantially contaminated by inconsistent functions, such as prosecuting, advocating, and investigating. He asserts an organization can properly perform inconsistent functions so long as the parts of the organization are kept sufficiently separate.[33] Davis urges reviewing courts should not allow an

---

26. Id., Sec. 13.05, p. 202.

27. Id., Sec. 13.05, p. 205.

28. Id., Sec. 13.06, p. 214.

29. Id., Sec. 13.06, p. 214.

30. Id., Sec. 13.07, pp. 216–217.

31. Id., Sec. 13.07, p. 218.

32. Id., Sec. 13.10, p. 236.

33. Id., Sec. 13.11, p. 248.

advocate to participate in judging. He further observes, if a deciding officer consults a staff specialist, who has testified, the need is not for protection against contamination, but for assurance of an appropriate opportunity to meet what is considered.[34]

Since the legislative objective in enacting Sections 13–1–1.1 and 13–1–1.3 was to separate the inconsistent functions performed by the P.S.C., these statutes should be interpreted in a manner consonant with the aforecited concepts supporting the principle of separation of functions in an administrative agency.

Section 13–1–1.1, provides:

"The *purpose* of this act is to *reorganize* the department of business regulation of the state of Utah *by separating the administrative functions from the quasi-judicial and rule-making functions*, and providing for an executive director who shall exercise all administrative functions within the department of business regulation and continuing the public service commission of Utah in existence within the department of business regulation by removing it from administrative channels." [Emphasis supplied]

*Section 13–1–1.3, provides:*

"The public service commission as established by 54–1–1, is continued in existence within the department of business regulation. *The public service commission shall not exercise administrative authority over the division of public utilities or over any other division within the department of business regulation; such administrative authority shall be exercised by the executive director of business regulation. The public service commission shall not be subject to the jurisdiction of the executive director of business regulation in regard to the exercise of its quasi-judicial or rule-making functions within the department*, except that the executive director of business regulation if he is also a member of the public service commission shall participate in delibera-

tions and decisions of the public service commission as may any other member. *The public service commission shall exercise all quasi-judicial and rule-making powers in regard to public utilities as provided in Title 54. The execution of any rules, regulations or orders of the public service commission issued pursuant to its quasi-judicial or rule-making power shall be made effective and administered under the executive director of the department of business regulation.*" [Emphasis supplied]

Under Title 54, the P.S.C. is assigned many diverse functions in fulfilling its role of supervising and regulating every public utility in this state, 54–4–1. The Commission or its staff under the Commission's direction and control has conferred upon it investigative and prosecutorial functions as well as the power to initiate certain types of hearings (advocacy).[35] In 1969, the legislature devised a plan providing by clear, specific mandate for the separation of functions. For organizational purposes the P.S.C. remains within the department of business regulation, but it is to function strictly as a deliberative (rule-making) and adjudicating body insulated from the other administrative functions, which hold the potential of contaminating its assigned functions. One method to avert commingling of inconsistent functions adopted by the Legislature was the removal of the staff (the division of public utilities) from the control and direction of the Commission by placing this authority with the executive director of the department of business regulation. The executive director has no authority over the P.S.C. in regard to its exercise of its quasi-judicial or rule-making functions, but he administers all other functions. Thus, those who act as advocates, investigators, and prosecutors on the one hand and those who are involved in deliberative and adjudicative functions on the other hand are not subject to the same superior authority.

In Section 13–1–1.1, the Legislature placed the terms "quasi-judicial and rule-

34. Id., Sec. 13.11, p. 249.

35. As examples of these types of functions see 54–4–2, 54–7–9, 54–7–12(2), 54–7–21, 54–7–24.

making functions" in juxtaposition to "administrative functions" to delineate the point of separation, assigning the former to the P.S.C. and the latter to the executive director, with all within the aegis of the department of business regulation. Thus, any function conferred on the P.S.C., by Title 54, which does not directly involve its performance as a deliberative or adjudicative body is transferred to a coordinate entity within the department of business regulation, the executive director.

■ Does the Division of Public Utilities, under the direction and authority of its statutory administrator, have standing to petition this Court to review an order of the P.S.C.? Emphatically, yes! Section 54–1–1 confers on the P.S.C. the power to sue and be sued. Section 54–7–16, which provides for an applicant or any party aggrieved to seek a review by this Court of an order or decision of the P.S.C., states:

" . . . The commission and each party to the action or proceeding before the commission shall have the right to appear in the review proceedings . . . ."

Furthermore, as in this case, when there is filed a rate increase, Section 54–7–12(2) provides:

" . . . the commission may either upon complaint, or upon its own initiative without complaint . . . enter upon a hearing concerning the propriety of such rate . . . ."

The Division on behalf of the director, in this case, was exercising statutory administrative functions as an advocate and investigator and had standing to represent the public interest in a review before this Court.

It is urged that it is unnecessary for the division to appear before this Court as an advocate to assert and protect the interests of the people of this state, since the Commission will safeguard and promote the public interest. In *Muench v. Public Service Commission* [36] the court responded to a similarly expressed argument as follows:

"To hold that the Public Service Commission should not only decide between those conflicting interests in its judicial capacity, but also should represent the state in protecting public rights, would make the Commission both judge and advocate at the same time. Such a concept violates our sense of fair play and due process which we believe administrative agencies acting in a quasi-judicial capacity should ever observe."

*State ex rel. Missouri Power & Light Company v. Riley* [37] illustrates the consequences of a legislatively mandated separation of functions. Under the law, the General Counsel of the Missouri Public Service Commission had the duty to act as attorney for the commission and also the duty to represent the public in all rate hearings before the commission. Because of his conflicting duties the General Counsel did not have the authority to seek review of an order of the commission. The legislature enacted a statute providing that the powers, duties and functions vested in the general counsel to the public service commission were transferred to the department of consumer affairs regulation and licensing. The general counsel was to be appointed by the director of that department. The Court gave effect to the clear intent of the legislature to divorce the previously conflicting functions performed by counsel for the Public Service Commission. The Court held that counsel had the authority to perfect a review of the commission's decisions, and that in so doing, he performed the duties of his office as intended by the legislature.

Some courts have determined whether an administrative agency is an aggrieved party with standing to seek review, by the nature of the function it performs. Administrative functions are contrasted with quasi-judicial functions with the latter denied standing to appeal without statutory authorization. Within this context, it is deemed an administrative function if the body be vested with extensive authority in order to discharge its duty of protecting substantial public inter-

---

**36.** 261 Wis. 492, 53 N.W.2d 514, 523 (1952).    **37.** Missouri C.A., 546 S.W.2d 792 (1977).

est. A quasi-judicial function is identified as one involving the exercise of discretion and requiring notice and hearing.[38] The Legislature, by severance of the administrative functions of the P.S.C. from the rule-making and quasi-judicial functions, vested the entity (the executive director) through his subordinates (the Division), with the exercise of the administrative functions, which include the right to seek review of a decision of the P.S.C.

HALL, J., concurs.

STEWART, J., having disqualified himself does not participate herein.

CROCKETT, Chief Justice (concurring with comments).

I concur with the main opinion. However, I desire to add some comments about two significant aspects thereof by stating them with such succinctness and clarity as I can achieve.

The first is my agreement with the main opinion's statement that there is nothing in our statutory law which restricts the authority of the Commission to conduct an abbreviated proceeding. It is my purpose to emphasize that there is not only nothing improper in doing so, but that on the contrary, in appropriate circumstances, it can be used in the saving of time, effort and expense to everyone concerned, as contrasted to the necessity of examining into the capital structure and operations of the entire utility whenever a change is requested.[1] This has advantages for everyone concerned, including ultimate beneficial effects upon the interests of the public. However, this does presuppose that there is properly before the Commission in that proceeding all of the relevant factors upon which to base its decision.

In supplementation of what has just been said, I do not think that the fact that the amendment to Sec. 54-7-12(1) which provides for what is referred to as a "pass through" increase in rates, by reason of increased fuel costs, should be deemed to prevent an analogous procedure with respect to other items of expense, such as a necessary general wage increase, if all of the other relevant factors are in some proper manner included in the proceeding and considered by the Commission.

My second observation is that it should be clearly understood that there is distinct differentiation to be made between the finding required by Secs. 54-3-1 and 54-7-12(2), U.C.A. 1953, that an increase must be "just and reasonable" which should entail consideration of the interests of all concerned, including those of the utility, and of the public, as contrasted to the finding the Commission made, that the proposed increase will not result in exceeding a reasonable rate of return for the utility on its capital structure. This is especially significant where it is not shown that all of the relevant factors were taken into consideration by the Commission.

WILKINS, Justice (dissenting):

I respectfully dissent on the ground that the Division of Public Utilities (hereafter "Division") lacks standing to appeal an order of the Public Service Commission (hereafter "Commission").

During the period between the filing of the applications for rate increases mentioned in the majority opinion and the hearing thereon, the Division conducted an investigation of the proposed increase and was permitted to inspect certain confidential material filed by Mountain Fuel Supply Company (hereafter "Mountain Fuel") in connection with the applications. The Committee of Consumer Services (hereafter "Committee"), which did not appeal the Commission's order here, was refused access

---

**38.** *Minnesota State Board of Health, v. Governor's Certificate of Need Appeal Board,* 304 Minn. 209, 230 N.W.2d 176, 179–180 (1975); *Minnesota Water Resources Board v. County of Traverse,* 287 Minn. 130, 177 N.W.2d 44 (1970); *Kentucky State Racing Commission,* C.A.Ky., 481 S.W.2d 298 (1972); *State v. Hix,* 132 W.Va.

516, 54 S.E.2d 198 (1949); *McTaggart v. Public Service Commission,* 168 Mont. 155, 541 P.2d 778 (1975).

**1.** Cf. statement in the main opinion referring to footnote 13.

to that material based on a protective order by the Commission during the hearing. On appeal, Mountain Fuel asserts that the confidential material was shown to members of the Division as *staff* of the Commission. At the Commission hearing, the attorneys for Mountain Fuel declared that they had been willing to allow the Division to view the confidential material because the Division was the staff of the Commission. Counsel for Mountain Fuel further stated that because Mountain Fuel, as the applicant, had a different relationship with the Division than with the other intervenors in the case, which included the Committee, Mountain Fuel made every effort to cooperate with the Division. Counsel for the Division did not object to the characterization of the Division as staff of the Commission.[1] Mountain Fuel's counsel stated that it had no objection to allowing the counsel for the Division access to the confidential material, and noted that two members of the staff had already examined the material in the process of the Division's investigation prior to the hearing.

This Court has not heretofore had the opportunity to explore the status of the Division in depth. The relationship between the Division and the Commission, governed by statute and regulation, is scanty at best, and the role of the Division is even more vague and undefinitive.[2]

Sections 13–1–1.1 and 13–1–1.3, enacted by the Legislature in 1969, separate the administrative functions in the Department of Business Regulation, which are to be exercised by the executive director thereof, from the quasi-judicial and rule-making functions, which are exercised, as to public utilities, by the Commission. The Commission remains, under the amended statutes, within the Department of Business Regulation, but is removed from "administrative channels," and expressly may "not exercise administrative authority over the division

of public utilities . . . ; such administrative authority shall be exercised by the executive director of business regulation." (Section 13–1–1.3) However, the executive director, who exercises administrative authority over the Division, is also charged in the same Section with "the execution of any rules, regulations or orders of the public service commission."

The Division acts, then, under authority of the executive director, to enforce the rules, orders and regulations of the Commission, although the Division is not under direct administrative control of the Commission.

Rule 14.9 of the Commission's Rules of Practice and Procedure Governing Formal Proceedings, states:

When the Commission's staff participates in a hearing it shall be regarded as a party in neither the support of nor in opposition to any application, petition, complaint, or investigation. Such appearance shall be solely for the purpose of assisting the Commission in discovering the facts pertinent to the issues involved.

This rule was adopted prior to the 1969 reorganization of the Department of Business Regulation but was not amended after the reorganization. However, it should be noted again that under Section 13–1–1.3, the executive director exercises administrative control over the Division, and the executive director is charged with "[t]he execution of any rules, regulations or orders of the public service commission of Utah issued pursuant to its quasi-judicial or rule-making power."

In sharp contrast to the uncertain status of the Division is the Legislative creation and definition of the Committee. In Section 54–10–1, et seq., the Legislature created the Committee as a subsection of the

---

1. The Division was represented before this Court and the Commission by counsel from the Utah Attorney General's office. We note that the attorney who remained silent in the face of the characterization above described is not the same attorney who asserted before this Court

that the Division is not staff of the Commission.

2. We can find mention of the Division only in the following Sections: 13–1–1.3, 54–10–2, 54–10–6.

Division. The Committee's stated purpose is to assist in representing residential and small commercial consumers before the Commission and to assess the impact of utility rates on such consumers. Section 54–10–4(3) specifically grants the Committee the following authority and duties:

The committee shall be an advocate on its own behalf and in its own name, of positions most advantageous to a majority of residential consumers as determined by the committee and those engaged in small commercial enterprises, and may bring original actions in its own name before the public service commission of this state or any court having appellate jurisdiction over orders or decisions of the public service commission, as the committee in its discretion may direct.

The Committee, under Section 54–10–6, may also request the Division to review the accounting procedures and expenditures of public utilities.

Significantly, the Division, unlike the Committee, has not been expressly granted, either by statute or otherwise, authority to sue in its own name, appear on behalf of itself or others before the Commission, or appeal Commission orders. It appears from past practice that the Division has primarily been involved in investigation of applications filed with the Commission, assisting the Commission with legal expertise in the area of public utilities law and enforcement of Commission orders under the direction of the executive director of the Department of Business Regulation. In these roles the Division may become privy, as was the case here, to confidential information which may not be discoverable by the Committee or other adverse parties. In this sensitive and difficult position, it is imperative that the integrity of both the Commission and Division be preserved. No organization, whether private or governmental, secular or religious, can effectively survive if one of its crucial component parts can wage hostile assaults upon its authority at will, even though the assaults are clothed with solemn concerns for "the larger good".

In *People v. Hively*,[3] the Colorado Supreme Court ruled that a county assessor, charged by the Board of Equalization with making additions and corrections to the assessment roll, had no standing to question the validity of the Board's orders. Quoting from *People v. Pitcher*, 61 Colo. 149, 156 P. 812 (1916), the court in *Hively* stated:

It is the imperative duty of a ministerial officer to obey the act of a tribunal invested with authority in the premises directing his action; not to question or decide upon its validity. This applies with the same force whether the direction be embodied in a legislative act or in the pronouncement of a governmental agency invested with power in the premises. The maxim lies at the very foundation of jurisprudence, and without its observance government would cease to exist. . .

\*    \*    \*    \*    \*    \*

Thus the Assessor here had no more standing to question the validity of the action of the Board than a lower court has to question the validity of the mandate of a reviewing court. He was obligated to carry out the mandate of the Board. There is *no* legal justification for his defiance and the District Court lacked jurisdiction to hear the case. . . . (emphasis in original).[4]

The Division argues that unless it has standing to assert the public interest before the Commission, the people of this state will have no advocate to assert and protect their interests before the Commission except to the extent that the people are represented by the Committee or a special interest group. However, it must be kept in mind that the duties of the Commission itself include the safeguarding and promotion of

**3.** 139 Colo. 49, 336 P.2d 721 (1959).

**4.** *Id.* at 139 Colo. 73, 74, 336 P.2d 734, 735. *See, also, Board of County Commissioners v. Love*, 172 Colo. 821, 470 P.2d 861 (1970); *I. T.* *O. Corp. of Baltimore v. Benefits Review Board*, 542 F.2d 903, 908, n. 5 (4th Cir. 1974), *cert. denied* 433 U.S. 908, 97 S.Ct. 2972, 53 L.Ed.2d 1092 (1977).

the public interest.[5]  To accomplish this the Commission is empowered by the Legislature to employ necessary personnel, including "experts" and "attorneys".[6]  By comparison, there is no statute which even establishes, much less defines, the nature or duties of the Division.  The Division's existence is noted in the statutes [7] but nowhere is the Division granted the right to litigate in its own name or otherwise, or, significantly, to appeal Orders of the Commission.

I believe that, absent express statutory authority granted by the Legislature, the Division of Public Utilities has no standing to appeal Orders of the Public Service Commission.  Indeed, the implication of Section 13–1–1.3 is that the Division on behalf of the executive director of the Department of Business Regulation, is charged to execute "any rules, regulations or orders of the public service commission of Utah issued pursuant to its quasi-judicial or rule-making power".  This Court should not allow the Division, and particularly in the absence of a definitive grant of authority by the Legislature, to assume the tension-filled role toward the Commission of both investigator-enforcer and adversary.

---

5. *See*, e. g., *United States Smelting, Refining and Milling Co. v. Utah Power & Light Co.*, 58 Utah 168, 197 P. 902 (1921); *Utah Light & Traction Co. v. Public Service Commission*, 101 Utah 99, 118 P.2d 683 (1941).

